IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

CHARLES H. RICHARD,     )
     PLAINTIFF,     )
v.     )
     )
ROCKY COAST, LLC,     )     No. 05-30097-MAP
     DEFENDANT.     )

**OPPOSITION OF DEFENDANT, ROCKY COAST, LLC, T0 PLAINTIFF'S,
MOTION FOR PRELIMINARY INJUNCTION AND MOTION FOR LIS PENDENS**

**INTRODUCTION**

In this action, plaintiff Charles H. Richard (Richard) seeks, among other things, specific performance of an agreement he had with defendant Rocky Coast, LLC to purchase a tract of land in Wilbraham, Massachusetts. Despite the fact that Rocky Coast, LLC was more than willing to sell Richard the land and sent Richard a deed and other documents in preparation for closing, Richard refused to close claiming that there is a "cloud" on the title that arose in 1958. After performing its own title review and additional research, Rocky Coast, LLC determined that this was not the case and found a title insurer willing to issue a policy on the land without exception. Regardless, Richard refused to close, so Rocky Coast terminated the agreement and offered Richard back the deposit. Richard now seeks not only to force Rocky Coast, LLC to take certain actions to "clear"the nonexistent title defect, but also to sell him the land under the terms of their original agreement once it does so.

Richard has moved for a preliminary injunction preventing Rocky Coast, LLC from marketing or selling the land to other buyers who are willing to accept title in its current form and that the court approve a notice of lis pendens. However, as discussed more fully below, Richard is not entitled to a preliminary injunction as he cannot show a likelihood of success on the merits

of his claim for specific performance and is not entitled to a lis pendens because he has no valid

claim to a conveyance of the land. Not only is title to the property clear, but even if it were not,

Richard is not entitled to specific performance or a lis pendens as a matter of law.

## FACTS

On February 17, 2005, Rocky Coast, LLC and Richard entered into a Purchase & Sale

Agreement under which Rocky Coast, LLC agreed to sell and Richard agreed to purchase certain

real property located in Wilbraham, Massachusetts identified as Lots 1, 2, 3, 4, and 5 Patriot

Ridge Lane (the Property).   The purchase price was six hundred and thirty thousand dollars

($630,000.00) and the closing was scheduled for March 3, 2005, which was later extended to

March 11, 2005.  (See Purchase and Sale Agreement attached as Exhibit 1).

Prior to entering into negotiations with Richard, Rocky Coast, LLC had no reason to

believe that the Property would be subject to any significant title problems or "cloud" on title.

(See Affidavit of Robert H. Greene, ¶ 6, attached as Exhibit 2).  The Property had been conveyed

by Deed on a number of occasions since 1958 when the "cloud" claimed by Richard appeared.  In

addition, on March 1, 1989, the First American Title Insurance Company (First American) issued

a "clean" Lender's Policy of Title Insurance to Rocky Coast, LLC's predecessor in title which

contains no exception or exclusion from coverage in any way related to the asserted "cloud."

(See Exhibit B to Affidavit of Robert H. Greene, attached as Exhibit 2, ¶¶ 7-8).

In anticipation of the closing, Rocky Coast, LLC's counsel, Richard H. Greene (Greene),

delivered to Richard's attorney an executed Deed along with other closing documents on March

3, 2005. (Exhibit 2, ¶ 10).  Late the following afternoon (a Friday), Richard's attorney left a

telephone message for Greene to the effect that his title examiner had just given him some type

2

of report suggesting that there was a significant cloud on the title for the Property.  Richard's

attorney did not provide any further details at that time, nor did he provide any documents

relating to the purported title problem.  (Exhibit 2, ¶ 11).

After playing the telephone message on Monday, March 7, 2005, Greene contacted

Richard's attorney and requested information and documents relating to the alleged title issue.

Greene was sent only a copy of a two-page "Title Report," dated March 4, 2005, which was not

on letterhead, did not state by whom the report was prepared, was not signed, and did not provide

any back-up documentation supporting its contents.  (See Affidavit of Greene at Exhibit 2, ¶ 12).

The report stated the following:

> **CLOUD ON TITLE:** Our current plan was once comprised of at least six
> different tracts.  One of these tracts was conveyed to a John F. Baldwin, by deed
> of Joseph J. Baldwin and William V. Baldwin, individually, and said Joseph J.
> Baldwin as Executor dated May 1, 1945 and recorded aforesaid in Book 1837,
> page 1; a portion of this tract (later conveyed back in) was deeded out by said
> John F. Baldwin immediately–Ruby S. Baldwin signed as spouse of said John F.
> Baldwin; John F. Baldwin then dies intestate leaving the tract to his wife, Ruby,
> and her two sons–our John F. Baldwin, Jr. and Joseph V. Baldwin; the estate
> never conveys out this piece–in 1979 John F. Baldwin (Jr.) conveys the tract with
> several others to make up our current plan; Missing the interest of Ruby S.
> Baldwin and Joseph V. Baldwin as heirs of John F. Baldwin (Sr.);
>
> Note: I think that people assumed that the grantee in 1945, John F. Baldwin was
> the same as the grantor in 1979 when this was not the case by evidence on record.
> (Also–Ruby S. Baldwin conveyed all her real estate held by her by DEEDS in the
> Hampden County Registry of Deeds–this would not have conveyed the tract
> inherited by her).  (See Exhibit A to Affidavit of Robert E. Greene, attached as
> Exhibit 2).

Greene responded by faxing Richard's counsel a copy of the 1989 First American Title

Insurance policy on the Property.  (Exhibit 2, ¶ 13).

On March 11, 2005, Greene obtained copies of some documents pertaining to the

Baldwin family conveyances and probate matters relating to the property in question. (Exhibit 2, ¶ 14).  After reviewing the then available documents, Greene sent to Richard's counsel the communications dated March 15, 2005 and March l6, 2005 referenced in Paragraph 7 of the Complaint (and attached as Exhibits D and E thereto), suggesting certain corrective actions that could be taken to "clear" the title.  (Exhibit 2, ¶ 15).  These included obtaining a Certificate of Death for Ruby S. Baldwin (to show the transfer by operation of law of the jointly held share of the property to John F. Baldwin, Jr. upon her death and to confirm her marital status at the time of her death), and a deed from the fiduciary of the estate of Joseph V. Baldwin of Connecticut.

On March 18, 2005, Greene obtained a copy of the Death Certificate for Ruby S. Baldwin indicating that she was not married at the time of her death in 1970.  (See Exhibit 3).  Greene also conducted research at the Massachusetts Bureau of Vital Statistics and obtained other information indicating that Joseph V. Baldwin died on June 27, 2002 at age 88 years, as a resident of Manchester, Connecticut, and he was survived by his wife Marie Baldwin.  A search of the available Connecticut records by an attorney in that area indicated that no probate was ever filed for the estate of Joseph V. Baldwin, and that the only action taken of record by Marie Baldwin subsequent to his death was unrelated to the Property.  (Exhibit 2, ¶¶ 16-17).  The available records, therefore, did not indicate whether or not Joseph V. Baldwin died with a will or whether he was survived by any children in addition to his wife Marie Baldwin.  (Exhibit 2, ¶ 18).

Based on this information, Greene decided that the most prudent course of action would be to conduct a more thorough search of registry records to attempt to account for the ownership interest of Joseph V. Baldwin in the Property prior to making contact with his widow.  Greene

requested that a title examiner run the grantor index at the Hampden County Registry of Deeds

and obtain copies of any and all recorded deeds ever executed by Joseph V. Baldwin.  (Exhibit 2,

¶ 19).  On March 22, 2005, Greene was provided with a copy of a Deed dated August 1, 1958

(the 1958 Deed) which, in his opinion, was sufficient to account for the ownership interest of

Joseph V. Baldwin in the Property.  (Exhibit 2, ¶ 20).   By operation of this deed, Joseph V.

Baldwin, his uncle William V. Baldwin, and his cousin Loyola W. Keating, conveyed to John F.

Baldwin, Jr. (one of Rocky Coast, LLC's predecessors in title):

> [a]ll and singular the real estate of record in said Hampden County now belonging
> to John W. Baldwin, late of said Wilbraham, not previously conveyed or devised.
> Subject to all encumbrances of record. The grantors and the grantee are all heirs of
> the said John W. Baldwin, deceased, and of Joseph J. Baldwin, deceased. (Exhibit
> 4).

The grantors and grantee were the sole remaining descendants of John W. Baldwin, who

was the sole owner of the property until his death in 1942 at which time equal interests were

devised to his three sons (William V. Baldwin, Joseph J. Baldwin, and John F. Baldwin (the

elder)), and his granddaughter, Loyola W. Keating (a  time-line showing the relevant

conveyances is attached as (Exhibit 5).

Greene immediately communicated his opinion regarding the 1958 Deed to Richard's

attorney as well as his title examiner, Elizabeth Ginter (Ginter).  (Exhibit 2, ¶ 21).  However,

Ginter rejected Greene's view, suggesting that the grantor, "Joseph V. Baldwin," was not the

correct "Joseph V. Baldwin" and that the property in his name, contrary to the language in the

deed, had already been conveyed or devised to him.  (Exhibit 2, ¶ 22).

On March 30, 2005 and April 5, 2005, Greene sent letters to the counsel for First

American Title Insurance Company and Mr. Richard's attorney expressing his opinion that the

1958 Deed did account for the ownership interest of Joseph V. Baldwin in the property based

upon the following grounds:

> a. It was apparent that Attorney Ginter overlooked that the Deed in question was also signed by "Marie Baldwin, wife of said Joseph V.," who was confirmed as the wife of the Joseph V. Baldwin in question and that there are no references in any other available records to any other "Joseph V. Baldwin;"

> b. Although the property had previously been conveyed by three of the four devisees of the property under the Will of John W. Baldwin, i.e. Joseph J. Baldwin, William V. Baldwin, and Joseph J. Baldwin as Trustee for Loyola W. Keating, to the fourth and remaining devisee, John F. Baldwin (the "elder" and the father of John F. Baldwin, Jr. and Joseph V. Baldwin), the property had never been conveyed by Joseph V. Baldwin;

> c. In addition, the other two grantors in the 1958 Deed, i.e. William V. Baldwin and Loyola W. Keating, had already "conveyed" their respective ownership interest in the property by Deed to John F. Baldwin (the elder) on May 1, 1945. Additionally, the 1958 deed references these three grantors as being all of the heirs of "...Joseph J. Baldwin, deceased," who was one of the grantors in the May 1, 1945 Deed described above;

> d. Greene opined that to interpret the language in the 1958 Deed "not previously conveyed or devised" in the manner suggested by Mr. Richard, his attorney, and his title examiner would lead to the untenable conclusion that all three of the grantors in the 1958 Deed were mistaken as to either their intent, their ownership interest in the property, or otherwise, so as to render the Deed of no consequence for any of the three grantors. The more obvious and reasonable interpretation of the Deed, and the interpretation that would render the Deed of effect, would be that the parties intended to convey and assure that John F. Baldwin, Jr. would obtain ownership of all property previously belonging to the late John W. Baldwin which had "not previously been conveyed or devised" to him, with the result being that John F. Baldwin, Jr. was the sole owner of the property.

Greene also applied certain well known principals of deed construction in

support of his position.   (Exhibit 2, ¶¶ 23-25).

On April 5, 2005, Greene's office issued a letter to Richard's attorney stating that, in light

of Rocky Coast, LLC's position that there are no impediments to title, Richard would be

expected to make a commitment that day to proceed to closing or Rocky Coast, LLC would

consider the Purchase and Sale Agreement to be of no further force and affect and would seek

another purchaser.  (Exhibit "D" to Affidavit of Greene attached as Exhibit 2).  The following

day, having received no response to this letter, Greene sent another letter to Richard's counsel

stating that Rocky Coast, LLC considered the Purchase and Sale Agreement to be of no further

force and affect and that Richard's deposit would be returned.  (Exhibits "E" to Affidavit of

Greene attached as Exhibit 2). He also sent a letter to the counsel for Connecticut Attorneys Title

Insurance Company ("CATIC") stating his position with respect to the title issues that had been

raised and requesting to be advised whether CATIC would have any reservations regarding

issuance of a title insurance policy for the Property.  In the letter, Greene states his analysis of the

1958 Deed as follows:

> Because this deed could not have referred to any other land other than the subject
> property and any ownership interest of JOSEPH V. BALDWIN in the property did
> not vest or come into existence until the intestate death of his father JOHN F.
> BALDWIN (the elder) on <u>January 10, 1947</u>, there could be no other reason nor
> purpose for the Deed other than the intent of JOSEPH V. BALDWIN to convey
> his ownership interest in the property to his brother  JOHN F. BALDWIN (the
> younger).  JOSEPH V. BALDWIN could not have executed such a Deed prior to
> the death of his father on January 10, 1947 as he had no interest in the property
> prior to that event....

Greene also points out that the entire Property was conveyed by John F. Baldwin, Jr. to a

Musselman by deed dated August 28, 1979, leading in the chain of title to Rocky Coast, LLC.

(Exhibit "H" to Affidavit of Greene attached as Exhibit 2).

On April 11, 2005, Greene received a letter from Richard's counsel accusing Rocky

Coast of acting in bad faith for not taking the corrective action suggested by Greene in his

communications of March 15, 2005 and March l6, 2005. (Exhibit "F" to Affidavit of Greene

attached as Exhibit 2). The letter also states that a local title insurer "would likely be able to effectively insure over the issues pertaining to the death of Ruby Baldwin, but they are unable to overcome the documented infirmities in the deed dated August 1, 1958 regarding the interest of Joseph V. Baldwin." Oddly, the "local insurer" turned out to be First American, the company that had issued the 1989 title policy on the Property to Rocky Coast, LLC's predecessor-in-interest. In a letter to Richard's counsel dated April 15, 2005, First American indicated that the company is unwilling to insure title to the Property due only to its uncertainty that the one-third interest of Joseph V. Baldwin was ever conveyed. Specifically, First American's letter references the 1958 Deed and the company's belief that the deed did not convey the one-third interest of Joseph V. Baldwin because said interest "was land that was BOTH devised and conveyed to his father John F. Baldwin (Sr. or elder), who was one of the heirs of John W. Baldwin." The letter further states that "the deed does not state that Joseph V. Baldwin is conveying the interest derived from his father. That may have been the intent of the deed, but based on actual deed language, we do not believe that the interest of Joseph V. Baldwin, which was derived from his father, was conveyed." (Exhibit 6).

On April 12, 2005, Greene responded to Richard's counsel with a letter stating, among other things, that the corrective actions suggested in his March 15 and 16, 2005 communications were appropriate before the 1958 Deed came to his attention and that Richard could not find fault with the seller if it were able to find another buyer who considered the title to the Property marketable in its current status and said buyer was able to obtain title insurance. (Exhibit "G" to Affidavit of Greene attached as Exhibit 2).

On April 12, 2005, Greene received a letter from CATIC stating that he could issue a

8

policy for the Property without exception.  (Exhibit "I" to Affidavit of Greene attached as Exhibit

2).

    This action was filed by Richard in the Superior Court Department of the Massachusetts

Trial Court, Hamden County, on April 20, 2005.   A Notice of Removal to the United States

District Court for Massachusetts  was filed by Rocky Coast, LLC on April 26, 2005.

## ARGUMENT

    "The purpose of a preliminary injunction is to preserve the status quo, freezing an

existing situation so as to permit the trial court, upon a full adjudication of the case's merits,

more effectively to remedy the discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast*

*Properties, Inc.*, 48 F.3d 618, 620 (1st Cir. 1995).     The Court must "determine the

appropriateness of granting or denying a preliminary injunction on the basis of a four-part test."

*Sunshine Dev. v. Federal Deposit Ins. Cor.*, 33 F.3d 106, 110 (1st  Cir. 1996); *see also Planned*

*Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir. 1981).  To demonstrate entitlement

to a preliminary injunction, the plaintiff must satisfy each of four separate criteria:  (1) that

plaintiff has exhibited a likelihood of success on the merits; (2) that plaintiff will suffer

irreparable injury if the injunction is not granted; (3) that such injury outweighs any harm which

granting injunctive relief would inflict on the defendant; and (4) that the public interest will not

be adversely affected by the granting of the injunction. *See Planned Parenthood,* 641 F.2d at

1009.

    The First Circuit has repeatedly emphasized that a plaintiff must satisfy each of these

criteria independently in order to justify the extraordinary relief of a preliminary injunction.  *See,*

*e.g., White v. Carlucci*, 862 F.2d 1209, 1212 (5th Cir. 1989); *LeBeau v. Spirito*, 703 F.2d 639, 642

(1st Cir. 1983)("None of these criteria should be slighted").  Additionally, this court has stated:

> A preliminary injunction is an extraordinary equitable remedy.  It requires intervention by the Court on an emergency basis, without the usual careful procedures and litigation methods–the exchange of information in discovery, evidentiary hearings, the full and complete briefing of the issues.  As such the law imposes on Plaintiffs the substantial burden of convincing the Court that they are likely to succeed ultimately and further, that if emergency relief is not granted, they will be "irreparably" harmed.

*Boston's Children First v. City of Boston*, 62 F.Supp.2d 247, 253 (D. Mass. 1999) *citing Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (holding that a moving party must make a clear or substantial showing of a likelihood of success where an injunction will alter, rather than maintain, the status quo).  Richard is not entitled to a preliminary injunction because he cannot show a likelihood of success on the merits of his claim for specific performance.

**I.    Richard Cannot Show a Likelihood of Success on the Merits that he is Entitled to Specific Performance as a Matter of Law.**

The ultimate relief sought by Richard in this action is a decree for specific performance requiring Rocky Coast, LLC to undertake certain actions deemed necessary by Richard to "clear" the title to the Property and, once this is accomplished, to convey the Property to Richard in accordance with the terms of the parties' February 17, 2005 Purchase and Sale Agreement.  However, Richard cites no law in support of his position that he is entitled to such relief.  Indeed, existing Massachusetts case law dictates otherwise.

In *Freedman v. Walsh*, 331 Mass. 401 (1954), the plaintiffs purchased land at an auction from trustees under a will.  Each paid a deposit and received a memorandum specifying the lot(s) purchased, the amount of the deposit and balance due, and the fact that taxes for that year would be apportioned as of the date of closing.  After the auction, plaintiffs learned that the land was

10

subject to adverse claims by the heirs of the decedent as a result of back taxes on the land that they had paid.  The plaintiffs each filed bills in equity seeking specific performance, including payment by the trustees of any and all outstanding rights of redemption for the taxes paid by the heirs of the decedent.  The court found that although the trustees had undertaken to convey the land by  good title free of encumbrances, "[a] decree for specific performance should not be entered if it appears that the defendants cannot transfer such a title, unless, of course, the plaintiffs are willing to accept as full performance whatever title the defendants can convey...or unless they elect to take conveyance with a deduction in the purchase price because of any defect in the title (internal citations omitted)." *Id.* at 403.

Similarly, in *Smith v. MacAlister*, 1 Mass.App.Ct. 22 (1972), another case in which a purchaser of land sought specific performance against the seller, the court stated

> "[w]hen a seller is unable to convey marketable title or is otherwise unable to fulfill its obligations under a contract to sell land, a purchaser will not be compelled to accept a lesser conveyance the seller may offer.  And in a contract action, the unwilling purchaser may recover any deposit he may have paid.  The buyer may, however, elect to accept partial performance. '(I)t is settled that being able and willing to perform, the (purchaser)can have (an agreement for the sale of land) specifically enforced in so far as the vendor is capable of compliance, with a deduction from the purchase price for any deficiency in title, or of quantity, or of quality of the estate to be conveyed (internal citations omitted).'"

*Id.* at *25.*  Both *Freedman* and *Smith* are indicative of "the traditional Massachusetts approach to land sale transactions: the buyer is not bound to take anything other than good title, but the seller is not liable for failure to have one." *Massachusetts Conveyancers Handbook*, § 1:16 (discussing the root of the common "escape clause").

The cases cited by Richard in support of his contention that Rocky Coast, LLC had an affirmative obligation under the covenant of good faith and fair dealing to take reasonable steps

to cure any defect in the title to the Property do not stand for that proposition at all,[1] nor do they support Richard's contention that he is entitled to specific performance.  Rather, all three cases involve actions by purchasers to recover their deposits on contracts for the sale of land on the basis that the sellers failed to use reasonable efforts to obtain permits, local approvals, or mortgage financing as they were obliged to do by the agreements in question.

Even if Rocky Coast, LLC were of the belief that there is a defect in the title to the Property, its  decision not to correct the defect does not constitute bad faith where the covenant of good faith and fair dealing cannot be invoked to create rights and duties not otherwise provided for in the existing contract and "[i]naction amounts to a lack of good faith in contract performance only when the contracting party had a duty to act." *UNO Restaurants, Inc. v. Boston Kenmore Realty Corp.,* 441 Mass. 376, 385 (2004) citing *Restatement (Second) of Contracts*, § 205 comment d.   Both *Freedman, supra,* and *Smith, supra,* provide that a seller who cannot convey good title has no duty to clear it.

Should it be determined that there is a valid  "cloud" on the title to the Property, Richard's  remedies are limited to recovery of his deposit (which Rocky Coast, LLC has already tendered), or accepting title to the Property in its current form with a deduction in the purchase

---

[1] *Stabile v. McCarthy*, 336 Mass. 399 (1957) (contract allowing seller to cancel if unable to obtain planning board approval prior to closing imposed obligation on seller to use reasonable efforts to obtain such approval); *Sechrest v. Safiol*, 383 Mass. 569 (1981) (contract providing that purchaser's obligations thereunder were conditioned on purchaser's obtaining local permits and approvals reasonably necessary for construction of a house impliedly contained an obligation on the part of purchaser to use reasonable efforts to obtain such approvals); *Lynch v. Andrew*, 20 Mass.App.Ct. 623 (1985) (purchasers did not make diligent efforts to obtain mortgage financing pursuant to financing condition in purchase and sale agreement).

price (which he refuses to do). Richard cites no legal authority for his claim that Rocky Coast, LLC can be compelled to correct any defects in the title to the Property and then convey the Property to him. Accordingly, he has not shown a likelihood of success on the merits of his claims for specific performance or breach of the covenant of good faith and fair dealing, and his request for a preliminary injunction restricting Rocky Coast, LLC from seeking another purchaser willing to accept title in its current form should be denied. Moreover, because he is not entitled to specific performance as a matter of law, Rocky Coast's Special Motion to Dismiss under G.l.c.184 §15(c) should be allowed and Richard's motion for approval of a notice of lis pendens should be denied.

**II.    Richard Has Failed to Show a Likelihood of Success on the Merits of His Claim That There is a Valid Cloud on the Title to the Property.**

In support of his Motion for Preliminary Injunction, Richard makes only a general allegation that he will be able to prove at trial that a valid title defect exists, without providing any explanation or argument in support of this contention. Indeed, Richard fails even to specify the nature of the defect being claimed.

While the March 4, 2005 "Title Report" prepared by Ginter identifies two potential title issues, i.e. the disposition of the interests of Ruby S. Baldwin and Joseph V. Baldwin, only the second issue is allegedly preventing First American from issuing a title policy on the Property. Richard's counsel states in his April 11, 2005 letter to Greene that a local title insurer "would likely be able to effectively insure over the issues pertaining to the death of Ruby Baldwin, but they are unable to overcome the documented infirmities in the deed dated August 1, 1958 regarding the interest of Joseph V. Baldwin." Additionally, First American's letter of April 15,

13

2005 indicates that the only reason for its unwillingness to issue a title policy (despite its

previous issuance of a policy in 1989) is the insurer's uncertainty regarding the interest of Joseph

V. Baldwin as a result of its current interpretation of the "not previously conveyed or devised"

language in the 1958 Deed.

Since Greene did in fact take the corrective action suggested in his March 15 and 16,

2005 communications with respect to the interest of Ruby S. Baldwin, i.e., obtaining her Death

Certificate to verify her unmarried state upon her death, Richard can hardly sustain a claim that

Rocky Coast, LLC failed to address this issue.  As a result, Richard's claim of a cloud on the title

to the Property necessarily relates only to the interest of Joseph V. Baldwin and the fact that his

title examiner and insurer are interpreting the 1958 Deed in a manner which makes no sense in

light of the conveyancing history of the Property.

The 1958 Deed conveys to John F. Baldwin, Jr. from Joseph V. Baldwin, William V.

Baldwin, and Loyola W. Keating

> "[a]ll and singular the real estate of record in said Hampden County now
> belonging to John W. Baldwin, late of said Wilbraham, not previously conveyed
> or devised.... The grantors and the grantee are all heirs of the said John W.
> Baldwin, deceased, and of Joseph J. Baldwin, deceased."

Richard's position, as expressed by First American in its April 15, 2005 letter, is that "the

deed does not state that Joseph V. Baldwin is conveying the interest derived from his father.

That may have been the intent of the deed, but based on actual deed language, we do not believe

that the interest of Joseph V. Baldwin, which was derived from his father, was conveyed."  As

justification for this position, First American states that Joseph V. Baldwin's interest in the

Property derived from his father  "was land that was BOTH devised and conveyed to his father

John F. Baldwin (Sr. or elder), who was one of the heirs of John W. Baldwin."

Rocky Coast, LLC's position is that the "not previously conveyed or devised" language refers to any interests in the Property still held by of Joseph V. Baldwin and the other grantors at the time of the conveyance. Application of several commonly accepted principals of deed construction necessarily leads to the same conclusion.

"It is well established that [d]eeds should be construed as to give effect to the intent of the parties, unless inconsistent with some law or repugnant to the terms of the grant. The intent of the parties is gleaned from the words used, interpreted in the light of the material circumstances and pertinent facts known to them at the time [the deed] was executed (internal citations and quotations omitted)." *Queller v. Skowron*, 438 Mass. 304, 311 (2002). "The practical construction given the deed by the parties as shown by their subsequent conduct may also be considered." *Murphy v. Donovan,* 4 Mass.App.Ct. 519, 527 (1976) citing *Bacon v. Onset Bay Grove Assn.*, 241 Mass. 417, 423 (1922). "[I]f the words used will permit, and if no positive rule of law prevents, a construction which will accomplish a reasonable object should be preferred to one which will render the whole attempt void." *Ames v. Chandler*, 265 Mass. 428, 432, 164 N.E. 616." *Brackett v. Pitcher*, 296 Mass. 295, 297 (1936). "If a deed will bear a double construction, and in one sense it can effect its purposes, it will receive the construction which will make it efficacious." *Haven v. Adams, et al.,* 86 Mass 80, 92 (1862).

Joseph V. Baldwin's ownership interest in the Property did not vest or come into existence until the intestate death of his father in 1947 (who owned the entire Property at that time). Since this was the only interest in the Property Joseph V. Baldwin ever had, and he did not convey or devise it prior to 1958, there could be no other reason or purpose for the 1958

15

Deed other than the intent of Joseph V. Baldwin to convey his ownership interest in the Property to his brother, John F. Baldwin, Jr.  Richard asserts that this is not the case because the land had been previously conveyed or devised to Joseph V. Baldwin's father.  But this is also true of any interests in the Property held by the other grantors in the 1958 Deed.  As a result, Richard's construction of the deed renders it without effect.

The clear intent of all three grantors in the 1958 Deed was to transfer to John F. Baldwin, Jr. any remaining interests in the Property held by the other living descendants of John W. Baldwin so that John F. Baldwin, Jr. ultimately would become the sole owner of the Property. He already owned a one-third interest in the Property outright, and another one-third interest as joint tenants with his mother.  In 1979, nine years after the death of his mother, John F. Baldwin, Jr. conveyed the entire Property to Musselman, who later conveyed it to Rocky Coast, LLC's predecessor.  Although twenty-three years passed between the time the Property was conveyed to Musselman and the time of Joseph V. Baldwin's death in 2002, Joseph V. Baldwin never made a claim on the Property, indicating by his conduct that he believed his interest in the Property had been conveyed to his brother in 1958.  Only Rocky Coast, LLC's interpretation of the 1958 Deed accomplishes this reasonable object and gives the deed effect, thus the defect claimed by Richard is not valid.

Additionally, the fact that Richard feels compelled to seek an order of the Court enjoining Rocky Coast, LLC from marketing the Property to other buyers in and of itself negates his contention that the property is not "marketable."  While Richard claims that the appropriate standard for determining "marketability" is whether title to the Property is good beyond a reasonable doubt, the cases he cites, as well as those cited therein, are either actions by buyers to

16

recover their deposits or actions by sellers seeking specific performance.  In the context of these cases, and in light of the settled rule in Massachusetts that a buyer cannot be forced to accept title that is not marketable, *see Smith, supra,* the "reasonable doubt" standard makes sense.  However, where Richard is the one seeking to compel Rocky Coast, LLC to correct an alleged defect in title and then convey the Property to Richard, Richard should have the burden of proving not only that a prudent man would pause and hesitate before investing his money, but also that a valid defect exists.

Where Richard has not shown a likelihood that he will be able to establish at trial that Rocky Coast, LLC is unable to provide good and clear record and marketable title to the Property, his Motion for Preliminary Inunction should be denied.

## III.  Balancing the Harms Requires Granting a Speedy Trial If the Court Decides a Preliminary Injunction Should Issue.

We have urged the Court that Richard does not have a reasonable likelihood of success, if, however, the Court disagrees, we submit that balancing the harms to the parties requires that the Court order a speedy trial.  Granting a preliminary injunction will obviously have the effect of tying up  Rocky Coast's investment for as long as it takes to resolve this case. The Rules contemplate the harm that will be caused to a restrained party by providing that the Court may order the trial of the action to be advanced and consolidated with the hearing of the application for a preliminary injunction, perhaps ordering a temporary restraining order as interim relief. See Fed. R. Civ. P. 65(a)(2) and (b).  Should the Court enter preliminary injunctive relief we request that it be made contingent upon: (1) the plaintiff's agreement to trial before a Magistrate Judge if necessary; (2) reducing by one half the time allowed for responding to paper discovery; (3)

discovery to be completed within 60 days; and (4) trial as soon as may be after the conclusion of discovery.  This procedure will effectively balance the harms between the plaintiff and defendant in the most equitable way.

## CONCLUSION

Based on all of the foregoing, plaintiff Charles H. Richard has not demonstrated a substantial likelihood of prevailing on the merits of his claim for specific performance.  As a result, Richard has no valid basis for claiming that Rocky Coast, LLC should be restrained from being able to sell or market the Property to another buyer who is willing to accept title to the Property in its current condition and his Motion for Preliminary Injunction should be denied. For the same reasons Rocky Coast's special motion to dismiss under G.L.c. 184 §15(c) should be allowed so Richard is not entitled to approval of a notice of lis pendens.

Dated: May 6, 2005

ROCKY COAST, LLC,
By its attorneys,


    /s/ Evan T. Lawson
Evan T. Lawson (BBO# 289280)
J. Mark Dickison (BBO# 629170)
Lawson & Weitzen, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210-1736
Telephone: (617) 439-4990
Facsimile:  (617) 439-3987

## PURCHASE AND SALE AGREEMENT

Property Address:    Lots 1, 2, 3, 4 and 5 Patriot Ridge Lane
                     Wilbraham, MA

This *17*day of February, 2005, **ROCKY COAST, LLC** of a Florida Limited Liability Company, successor by merger to ROCKY COAST, LLC, a Maine Limited Liability Company with a place of business located at 50 Portland Pier, Suite 400, Portland, Maine 04101 hereinafter called the SELLER, agrees to SELL and **CHARLES H. RICHARD** of 32 High Pine Circle, East Longmeadow, Massachusetts, hereinafter called the BUYER or PURCHASER, agrees to BUY, upon the terms and conditions hereinafter set forth, the premises known and numbered as Lots 1, 2, 3, 4 and 5, Patriot Ridge Lane, Wilbraham, Hampden County, Massachusetts ("Premises"), being a portion of the premises described in a Plan as more particularly described in the attached Exhibit "A" and relating to the premises more fully described in the Hampden County Registry of Deeds at Book 11182, Page 221.  The property is also described on a plan entitled "Patriot Ridge Lane Definitive Flexible Subdivision, Definitive Plot Plan, dated November 13, 2003 prepared by Huntley Associates, PC, and recorded on May 14, 2004 at Book of Plans Book 332, Plan 113 in said Registry of Deeds.

1.    Personal Property Included:

      Included in the sale as part of said Premises are all trees, shrubs, and plants and any and all improvements located at the Premises.

2.    Conveyance of Title:

      Said premises are to be conveyed on or before March *13*, 2005 and the Premises will be conveyed by a good and sufficient Quitclaim Deed of the SELLER, transferring good and clear, record and marketable title to the same free from all encumbrances, except:

      (a)  Usual public utilities servicing the property, if any;

      (b)  Such taxes for the current year as are not due and payable on the date of delivery of such Deed;

      (c)  Any liens for municipal assessments and/or orders for which assessments may be made after the date of this Agreement;

      (d)  Subject to restrictions and easements of record, if any, which do not materially affect the value or intended use and enjoyment of the Property.  Such restrictions, encumbrances and easements are known to include the following:

            (i)   Order of Conditions (WPA Form 5) issuing from the Wilbraham Conservation Commission dated October 7, 2003 recorded at Book 13708, Page 476.

299121                                      1

(ii)    Any easements and rights of way described on the Plan of Land recorded at Plan Book 332, Page 113 on May 14, 2004;

(iii)    Open Space Deed (of Lot 9) recorded at Book 14171, Page 587.

(iv)    Notice of Decisions (Special Permit Application) issuing from the Planning Board recorded at Book 14171, Page 589;

(v)    Grant of easement at Book 14171, Page 596

(vi)    Conveyance of Easement Rights in Street (over Patriot Ridge Lane) recorded at Book 14171, Page 599;

(vii)    Subdivision of Covenant in Lieu of Bond recorded at Book 14172, Page 1

(viii)    Declaration of Protective Covenants recorded at Book 14172, Page 6.

(e)    Provisions of existing building and zoning laws provided the same do not prevent Buyer from building single family homes on each of the lots to be purchased;

3.    Purchase Price:

The agreed purchase price for said premises is SIX HUNDRED THIRTY THOUSAND AND 00/100 ($630,000.00) DOLLARS, of which ONE THOUSAND DOLLARS ($1,000.00) has been deposited with the BUYER'S offer and TWENTY FOUR THOUSAND AND 00/100 ($24,000.00) DOLLARS has been paid as a deposit this day. SIX HUNDRED AND FIVE AND 00/100 ($605,000.00) DOLLARS is to be paid at the time of delivery of the deed in cash, cashier's check, bank check, or attorney's trust fund check.

4.    Date and Location of Closing:

The Deed is to be delivered and the consideration paid, at the offices of Bacon & Wilson P.C., 33 State Street, Springfield, Massachusetts on, in which the deed should, by law, be recorded on March 3, 2005, unless some other place and time should be mutually agreed upon.

5.    Application of Funds to Clear Title:

To enable the SELLER to make conveyance as herein provided, the SELLER may, at the time of delivery of the deed, use the purchase money or any portion thereof, to clear the title of any and all encumbrances or interests, provided that all instruments so procured are recorded simultaneously with the delivery of said deed.

6.    Access to Property:

Prior to closing, Buyer or Buyer's agents, employees or contractors shall have the right to enter onto the property being sold hereunder for the purpose of conducting measurements and soils tests. However, Buyer shall indemnify and hold Seller harmless from all damages to persons or property while Buyer or Buyer's agents are on the property and return the property to the condition it was in prior to Buyer's entry on the property.

7.    Possession of Premises:

Full possession of the said premises, free of all tenants and occupants is to be delivered to the BUYER at the time of the delivery of the Deed, the said premises to be then in the same condition in which they now are.

8.    Closing Adjustments:

Taxes shall be apportioned as of the day of delivery of the Deed. If the amount of said taxes is not known at the time of the delivery of the Deed, they shall be apportioned on the basis of the taxes assessed for the preceding year with a reapportionment as soon as the new tax rate and valuation can be ascertained, which latter provision shall survive the delivery of the Deed.

9.    Deposit:

All deposits made hereunder shall be held by Bacon & Wilson P.C as escrow agent under the terms of this Agreement and shall be duly accounted for at the time for performance of this agreement.

10.    Default by BUYER:

If the BUYER shall fail to fulfill the BUYER's agreements herein, all deposits made hereunder by the BUYER shall be forfeited by the BUYER and retained by the SELLER as liquidated damages as SELLER's sole remedy at law or in equity.

12.    Underground Storage Tanks:

The SELLER represents that upon its information and belief, and all sources of information made available to the SELLER, that there are no underground storage tanks at the Premises. Notwithstanding, the SELLER does not and cannot warrant that there are no underground storage tanks at the Premises.

13.    Acceptance of Deed by BUYER:

The acceptance of a deed by the BUYER or his nominee as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

299121                                                  3

14.    Representation as to Brokers:

The SELLER acknowledges that they have been assisted throughout this process by New England Discount Realty (the "Broker") and the SELLER hereby holds the BUYER harmless with respect to any and all costs associated with commission due to the Broker.

15.    Construction of Agreement:

This instrument, executed in triplicate, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and inures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be cancelled, modified or amended only by a written instrument executed by both the SELLER and the BUYER. If two or more persons are named herein as BUYER or SELLER their obligations hereunder shall be joint and several.

16.   Survivability:

All obligations which shall potentially occur after the date of this Agreement shall survive the closing.

17. Additional Conditions.

a.    The SELLER has posted a bond with the Town of Wilbraham as required by this Agreement and upon completion of work at the subdivision and/or the completion of the obligations secured by said bond; the BUYER will cooperate with the SELLER to have all remaining proceeds of the bond released.

b.    This Agreement is also subject to the SELLER providing the BUYER with a mutually satisfactory right of first refusal for lots 6, 7, and 8 located within the subdivision of which the Premises are a part. The Agreement reflecting this right will be in a form deemed to be satisfactory to both parties to this Agreement.

c.    The SELLER agrees to obtain all necessary municipal easements to assure the availability of a connection to the proposed single family residence of installed and completed utility services including sewer, electricity, telephone, and cable, along with all necessary governmental permits for the installation of the above mentioned utilities.

d.    Subject to the BUYER'S confirmation that each lot is a buildable lot for which all necessary state and local permits can be obtained to erect separate single dwellings and/or the Buyers satisfaction with all conditions that might affect or interfere with the timely issuance of said building permits.

e.    SELLER represents that it has no knowledge of any improvements or assessments for public improvements which have been made against the premises which remain unpaid.

f.    SELLER agrees that it will remain responsible for the installation of a top coat upon the cul de sac area and Patriot Ridge Lane as described on said Plan and the specific landscaping for which the SELLER has already arranged with its own contractor, but represents that in accordance with its Agreement with the Planning Board of the Town of Wilbraham, in exchange for a donation by Rocky Coast,

LLC to the Sidewalk Fund of the Town of EIGHT THOUSAND FOUR HUNDRED AND 00/100 ($8,400.00) DOLLARS on January 6, 2005, the SELLER satisfied the sidewalk requirements of the Town and its Planning Board, so that the SELLER is not responsible for the construction of any sidewalks in the subdivision area.

18.    Due Diligence Period. The BUYER has the right to obtain at BUYER's own expense an inspection with any and all consultants of the SELLER's choosing on or before twenty one (21) days from the date of this Agreement. If the BUYER shall not be satisfied with the condition as determined by said inspection, BUYER shall have the right to terminate this Agreement in which case all sums paid this date shall be refunded and the obligations of both parties shall thereupon cease PROVIDED HOWEVER, the BUYER shall notify SELLER in writing of their election to so terminate on or before twenty one (21) days from the date of this Agreement. The BUYER shall conclusively waived their rights under this subparagraph as to termination is they shall not give SELLER notice in writing of their election to so terminate on or before twenty one (21) days of this Agreement. IN CONSIDERATION of this right of inspection and rescission SELLER is released from liability relating to defects in the premises actually disclosed or defects about which SELLER has no actual knowledge prior to the conveyance of the property.

Also see the Addendum "A" attached here and incorporated by reference.

**EXECUTED AS A SEALED INSTRUMENT** on the day and year first above written.

Signed and delivered
in the presence of:

ROCKY COAST, LLC

Witness                                    BY: _____  Manager

                                                                SELLER

Witness                                    Charles H. Richard,    BUYER

# Addendum to Purchase and Sale Agreement

Notwithstanding the conveyance by the SELLER to the BUYER of title to the property, the SELLER ROCKY COAST, LLC shall retain and continue have the sole and exclusive ownership interest in any and all funds tendered by the SELLER upon the two particular performance Bonds described below.

BOND TO THE WILBRAHAM CONSERVATION COMMISSION:
Amount of Bond=                                    $15,000.00

BOND TO PLANNING BOARD OF THE TOWN OF WILBRAHAM
Amount of Bond=                                    $33,000.00

Upon issuance by the Commission and the Planning Board of Certificates of Compliance with the conditions of the respective Bonds, or communication by the Commission and the Planning Board at an earlier date of notice of satisfaction with the Bond(s), all funds so tendered by the SELLER for the Bond shall be refunded solely to the SELLER ROCKY COAST, LLC.

In the event that there are any claims in any amounts upon either or both Bonds on account of any action, conduct or omission of the BUYER and/or anyone acting as his agent or on his behalf, then the BUYER shall reimburse the SELLER pro tanto for any amount so deducted by the Commission and/or the Planning Board at the time of the tender of payment back to ROCKY COAST, LLC, said payment by the BUYER to the SELLER herein within 10 days of receipt of any accounting for the funds constituting the Bonds and payment thereupon.


SELLER (ROCKY COAST, LLC)          BUYER (CHARLES H. RICHARD)
Dated: February 17, 2005           Dated: February 17, 2005

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, SS                     TRIAL COURT DEPARTMENT
                                SUPERIOR COURT
                                CIVIL ACTION NO. 05-407

CHARLES H. RICHARD,             )
                                )
        Plaintiff               )
                                )
v.                              )
                                )
ROCKY COAST, LLC                )
                                )
        Defendant               )
                                )

AFFIDAVIT OF ROBERT H. GREENE

1.  My name is ROBERT H. GREENE and I am an attorney at law
    practicing continuously since December, 1978 in the Commonwealth of
    Massachusetts, with law office presently located at 1135 North Main
    Street, Brockton, Massachusetts.

2.  A significant portion of my law practice over the last 20 years has been
    applied towards real estate, including conveyances of residential and
    commercial property, foreclosure of hundreds of mortgaged properties,
    extensive title examinations and analysis of hundreds of properties
    located in Massachusetts, addressing title issues and resolving title
    problems for numerous properties, and acting as a title agent for a
    number of title insurance companies.

3.  I have been a member of the New England Land Title Association and the
    Massachusetts Conveyancer's Association for almost 20 years.

4.  I have also been involved in numerous litigation cases involving title
    related matters and on a number of occasions I have represented clients
    in real estate related matters which have been the subject of review by
    appellate courts of the Commonwealth of Massachusetts ( Ahern v.
    Warner and Finn,  16 Mass.App.Ct. 223 (1983) (rights of lateral
    support); NAB Asset Venture III, L.P. v. Brockton Credit Union, 62
    Mass.App.Ct. 181 (2004) (dragnet clause in mortgage); Money
    Store/Massachusetts v. Hingham Mutual Fire Insurance Co., 430 Mass.
    298 (1999), reversing 46 Mass.App.Ct. 626 (1999) (junior mortgage claim

of insurance proceeds); Martignetti v. Haigh –Farr, Inc., 425 Mass. 294 (1997)(scope of site "operator" liability under Chapter 21E).

5. I represented the Defendant in this action ROCKY COAST, LLC, with regard to the negotiation of the Purchase & Sale Agreement dated February 17, 2005 with Mr. Richard referred to and appearing as Exhibit "A" of the Complaint.

6. Prior to entering into negotiations with Mr. Richard, Rocky Coast, LLC had no reason to believe that the subject real estate would be subject to any significant title problems or "clouds" on title.

7. Specifically, the subject property had been conveyed by Deed on a number of occasions since the conveyance by Deed from John F. Baldwin to Byron I. Musselman and Ethel Musselman dated August 28, 1979 recorded at Book 4823 Page 133 at the Hampden County Registry of Deeds.

8. In addition, on March 1, 1989, First American Title Insurance Company issued a "clean" Lender's Policy of Title Insurance to my client's predecessor in title Vanguard Bank, Policy No. 5012618 (a copy of which is attached and marked Exhibit "A")- the policy contains no exception nor exclusion from coverage in any way related to the title problem to which Mr. Richard and his attorney have made reference, i.e. the purported unexplained ownership interest in the property of Joseph V. Baldwin.

9. The Purchase & Sale Agreement between the parties originally anticipated a "closing" date of March 3, 2005, but by agreement of the parties, the date of closing was extended to March 10, 2005.

10. In anticipation of the "closing", I believe on or about March 3, 2005, Rocky Coast, LLC delivered directly to Mr. Richard's attorney an executed Deed, Right of First Refusal and a Partial Discharge of Mortgage

11. Late Friday afternoon, March 4, 2005, Mr. Richard's attorney left a telephone message on the answering machine at my office to the effect that his title examiner had just given him some type of report which caused him alarm as the report suggested there was some type of significant cloud on title- the attorney did not provide any further details at that time nor did he provide any documents relating to the purported title problem at that time.

12. After playing the telephone message back on Monday, March 7, 2005, I contacted Mr. Richard's attorney and requested information and

documents relating to the purported title problem, and on March 6, 2005 I received the attached Title Report dated March 4, 2005 (attached and marked Exhibit "B") from Mr. Richard's attorney, but no other documentation.

13. On March 8, 2005 I faxed to Attorney Mirkin's office the copy of the First American Title Insurance policy referred to above and attached hereto.

14. On March 11, 2005, I received copies of documents pertaining to the Baldwin family conveyances and probates matters relating to the property in question- these documents did not include a copy of a Deed from Joseph V. Baldwin et al to John F. Baldwin (the younger) dated August 1, 1958

15. After reviewing the then available documents I issued the communications dated March 15 and March 16th referred to in Paragraph 7 of the Complaint, again, based upon the then available documents and information.

16. Based upon the then available information, on March 18, 2005 I conducted research at the Massachusetts Bureau of Vital Statistics in South Boston and also obtained information pertaining to this John V. Baldwin, whose alleged missing ownership interest in the property is apparently the issue of concern to Mr. Richard and his attorney.

17. The information and documents I obtained confirmed that this Joseph V. Baldwin died on June 27, 2002 at age 88 years, as a resident of Manchester, Connecticut, and he was survived by his wife Marie Baldwin. A search of the available Connecticut records by an attorney in that area indicates that no probate has ever filed for the estate of Joseph V. Baldwin, and the only action Marie Baldwin took of record subsequent to his death was in September, 2002 when she applied and obtained a Certificate of No Tax Due for a condominium unit that Mr. And Mrs. Baldwin owned in Manchester, Connecticut.

18. The available records, therefore, did not indicate whether or not Joseph V. Baldwin died with a will or whether he was survived by any children in addition to his wife Marie Baldwin.

19. Prior to making any contact with Marie Baldwin, I requested a title examiner to run the grantor index at the Hampden County Registry of Deeds and obtain copies of any and all recorded deeds ever executed by this Joseph V. Baldwin- it was my then opinion that before attempting to contact Marie Baldwin, which might lead to unpredictable consequences, that every effort must be made to account for the ownership interest of

Joseph V. Baldwin based upon any available documents of record, particularly since it was apparent that his brother John F. Baldwin, the grantor in the August 29, 1979 deed to Musselman, the grantee in that Deed, i.e. Musselman, were obviously of the impression that John F. Baldwin was the sole owner of the property, and that all subsequent owners of the property, as well as First American Title Insurance Company, and its agents and attorneys who issued the above described Lender's Policy of title insurance on its behalf on March 1, 1989, shared that impression and position.

20. On March 22, 2005 the title examiner retained by my office faxed a copy of the August 1, 1958 Deed to my office. My analysis and opinion, based upon other available documents and information, as well as an attempt to confer a reasonable meaning and intent to the deed, was that although the deed was somewhat confusing and imprecise, that the Deed was sufficient to account for the ownership interest of Joseph V. Baldwin in the property.

21. I communicated my opinion to Mr. Richard's attorney and directly to his title examiner, Elizabeth Ginter.

22. Attorney Ginter communicated a rejection of my opinion of the Deed, suggesting that the grantor therein "Joseph V. Baldwin" was probably an uncle [presumably meaning an uncle of the grantee John F. Baldwin], and not the brother of John F. Baldwin, and that the property, contrary to the langue in the deed, had already been conveyed or devised.

23. In addition, on March 30, 2005 and April 5, 2005, I communicated the attached letters to the counsel for First American Title Insurance Company and Mr. Richard's attorney (marked Exhibit "C").

24. I adhered to my opinion that the August 1, 1958 Deed did, in fact, account for the ownership interest of Joseph V. Baldwin in the property, primarily upon the following grounds:

a. It was apparent that Attorney Ginter overlooked that the Deed in question was also signed by "Marie Baldwin, wife of said Joseph V.",- since Marie was confirmed as the wife of the Joseph V. Baldwin in question and there are no references in any other available records to any other "Joseph V. Baldwin," the grantor in this Deed had to be the same Joseph V. Baldwin;

b. Although the property had previously been conveyed by three of the four devisees of the property under the Will of John W. Baldwin, i.e. Joseph J. Baldwin, William V. Baldwin, and Joseph J. Baldwin as Trustee for Loyola Weeks, to the fourth and remaining devisee John

F. Baldwin (the "elder") John F. Baldwin and the father of John F. Baldwin the "younger" and Joseph V. Baldwin), the property had never been conveyed by this Joseph V. Baldwin;

c. In addition, the other two grantors in the August 1, 1958 Deed, i.e. William V. Baldwin and "Loyola W. Keating" Weeks, had, in fact already "conveyed" their respective ownership interest in the property by Deed to John F. Baldwin (the elder) dated May 1, 1945 recorded at Book 1837 Page 1, the interest of Loyola W. Keating having been conveyed by "Joseph J. Baldwin as Executor and Trustee under the will of John W. Baldwin, late of said Wilbraham, for the benefit of Loyola C. Weeks (now Loyola C. Weeks Keating)"; it should also be noted that there is a reference in the 1958 deed to these three grantors being all of the heirs of "...Joseph J. Baldwin, deceased," who was one of the grantors in the May 1, 1945 Deed described above;

d. Consequently, to interpret the language in the August 1, 1958 Deed "not previously conveyed or devised" in the manner suggested by Mr. Richards, his attorney, and his title examiner would lead to the untenable conclusion that all three of the grantors in the 1958 Deed of were mistaken as to either their interest in the property, or otherwise, so as to render the Deed of no consequence for any of the three grantors;

e. The more obvious and reasonable interpretation of the Deed, and the interpretation that would render the Deed of effect, would be that the parties to the Deed wished to assure that John F. Baldwin (the younger) was the sole owner of the property and they intended to assure that regardless of any previous conveyance to John F. Baldwin (the elder), they intended by the Deed to convey and assure that John F. Baldwin (the younger) would obtain ownership of all property referred to belonging to the late John W. Baldwin which had "not previously been conveyed or devised."" to John F. Baldwin (the younger).

25.    In addition, in reaching my opinion and conclusion regarding the validity, force and effect of the August 1, 1958 Deed, I also applied certain well- known principles of deed construction, which I believe Mr. Richard, his attorney and his title examiner might have overlooked. First, it is a long established rule of construction that the language in a deed, being the language of the grantor, is to be construed most strongly against the grantor. Thayer v. Payne, 2 Cush. 327, 331 (1848). Second, every Deed should be construed so as to give effect to the intent of the parties unless to do so would be inconsistent with some rule of law or repugnant to the terms of the grant. E.g. Bass River Savings Bank v. Nickerson, 303 Mass.

332 (1939); Simonds v. Simonds, 199 Mass. 552. Consequently, in the immediate case this principle would estop the grantor Joseph V. Baldwin (and any persons claiming through him) from challenging the conveyance of the property to his brother John F. Baldwin. Mr. Richard's attorney and his title examiner have failed to indicate why such an interpretation of the Deed would be inconsistent with some rule of law or "repugnant" to the terms of the Deed.

26. On April 5, 2005, my office issued the attached letter (marked Exhibit "D") to the attorney representing the Plaintiff Richards, and on April 6, 2005 my office issued the attached letter (marked Exhibit "E") to the Mr. Richard's attorney.

27. On April 11, 2005, I received the attached letter of said date by fax communication from the attorney representing Charles Richard (marked Exhibit "F").

28. On April 12, 2005, I issued the attached letter to the attorney representing Charles Richard (Exhibit "G")

29. On April 6, 2005 I communicated the attached letter to the counsel for Connecticut Attorneys Title Insurance Company ("CATIC") (Exhibit "H").

30. On April 12, 2005 the counsel for CATIC telephoned my office and indicated that CATIC shared my opinion as to the interpretation of the Deed in question.

31. Thereafter, I received the attached letter dated April 12, 2005 from CATIC (attached as Exhibit "I").

32. In addition, I also note that in the letter from Attorney Leecock of First American Title Insurance to Attorney Murphy dated April 15, 2005 which is attached to the Complaint, Attorney Leecock fails to explain why First American was willing to issue the title insurance policy for the same property back on March 1, 1989, but First American was now unwilling to issue a title insurance policy.

Signed under the pains and penalties of perjury this 22nd day of April, 2005

ROBERT H. GREENE

9

**TITLE REPORT NO.** 05-175                                    **DATE:** March 4, 2005

**TO:**     Francis R. Mirkin, Esquire
            Bacon & Wilson, PC

**LOCATION:**
            Patriot Ridge Lane
            Wilbraham, MA
            Lots 1 through 5, Book of Plans 332, Page 113

**EXAMINATION COMMENCES:**          May 1, 1945

**EXAMINATION ENDS:**               February 28, 2005 at 8:00 AM

**TITLE STANDS IN:**    Rocky Coast, LLC (a Florida LLC, pob Portland),
                        Lots 1-5 being part of the premises conveyed by foreclosure deed of Atlantic National
                        Trust Limited Liability Company dated April 11, 2000 and recorded as aforesaid in Book
                        11182, Page 221.

**SUBJECT TO:**

1.      **CLOUD ON TITLE:**   Our current plan was once comprised of at least six
different tracts.   One of these tracts was conveyed to a John F. Baldwin by deed of
Joseph J. Baldwin and William V. Baldwin, individually, and said Joseph J. Baldwin as
Executor dated May 1, 1945 and recorded as aforesaid in Book 1837, Page 1; A portion
of this tract (later conveyed back in) was deeded out by said John F. Baldwin
immediately---Ruby S. Baldwin signed as spouse of said John F. Baldwin;   John F.
Baldwin then dies intestate leaving the tract to his wife, Ruby, and two sons---our John
F. Baldwin, Jr. and Joseph V. Baldwin; the estate never conveys out this piece---in 1979
John F. Baldwin (Jr.) conveys the tract with several others to make up our current plan;
Missing the interest of Ruby S. Baldwin and Joseph V. Baldwin as heirs of John F.
Baldwin (Sr.);

Note:   I think that people assumed that the grantee in 1945, John F. Baldwin was the
same as the grantor in 1979 when this was not the case by evidence on record.   (Also—
Ruby S. Baldwin conveyed all her real estate held by her by DEEDS in the Hampden
County Registry of Deeds—this would not have conveyed the tract inherited by her.)

2.      Blanket Mortgage, present owner to Atlantic National Trust Limited Liability
Company for $175,000.00, dated May 28, 2002 and recorded as aforesaid in Book
12377, Page 482; assigned three times and presently held by Atlantic National Trust,
LLC (came back to them) under instrument dated May 12, 2004 and recorded as
aforesaid in Book 14144, Page 265;

3.      Order of Conditions under the Wetlands Protection Act by the Town of
Wilbraham Conservation Commission, DEP File No. 341-275 recorded as aforesaid in
Book 13708, Page 476 on October 24, 2003; (contains special conditions);

4.     Notice of Decision/Special Permit/Site Plan Approval issued by the Town of Wilbraham as set forth under instrument dated October 22, 2003 and recorded as aforesaid in Book 14171, Page 587; (contains special conditions):

5.     Easement rights in ways on plan in favor of the Town of Wilbraham as set forth under instrument dated May 6, 2004 and recorded as aforesaid in Book 14171, Page 599;

6.     Subdivision covenant in lieu of bond by the Town of Wilbraham Planning Board as set forth under instrument dated May 6, 2004 and recorded as aforesaid in Book 14172, Page 1;

7.     Declaration of Protective Covenants as set forth under instrument dated May 6, 2004 and recorded as aforesaid in Book 14172, Page 6;

8.     Easement rights in favor of Verizon New England, Inc. for underground system as set forth under instrument dated February 10, 2005 and recorded as aforesaid in Book 14828, Page 519;

9.     Easement rights in favor of Verizon New England, Inc. for overhead system as set forth under instrument dated February 10, 2005 and recorded as aforesaid in Book 14828, Page 522;

10.     Present owners bought at foreclosure---between mortgage & foreclosure the Town of Wilbraham put on 2 Statements to Continue Municipal Liens dated September 21, 1994 and recorded as aforesaid in Book 8952, Page 208 and dated September 25, 1995 and recorded as aforesaid in Book 9258, Page 502; according to the statute, the Town of Wilbraham must record RENUNCIATIONS for these to be officially taken care of on record.

11.     Sewer Assessment for "Maple Street" in the amount of $1950.00 vs. Byron I. Musselman, et als (prior owners) as set forth under instrument dated February 2, 1977 and recorded as aforesaid in Book 4382, Page 362;

12.     Ancient aqueduct rights in favor of the Cutter Company as set forth under instrument dated November 7, 1899 and recorded as aforesaid in Book 600, Page 9; if still in force and applicable;

/eag
E 1207-24

ALTA Loan Policy
(6-1-87)

Policy № 5012168



# POLICY OF TITLE INSURANCE

### ISSUED BY

## *First American Title Insurance Company*

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land;
5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;
6. The priority of any lien or encumbrance over the lien of the insured mortgage;
7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:
   (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or
   (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
8. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

IN WITNESS WHEREOF, First American Title Insurance Company has caused this policy to be signed and sealed by its duly authorized officers as of Date of Policy in Schedule A.

*First American Title Insurance Company*

BY [signature] PRESIDENT

ATTEST [signature] SECRETARY



# EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

   (c) resulting in no loss or damage to the insured claimant;

   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material); or

   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

## CONDITIONS AND STIPULATIONS

### 1. DEFINITION OF TERMS.

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A. The term "insured" also includes

(i) the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, the rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land);

(ii) any governmental agency or governmental instrumentality which is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage, or any part thereof, whether named as an insured herein or not;

(iii) the parties designated in Section 2(a) of these Conditions and Stipulations.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule (A), and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule (A), nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or water-ways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A or the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

### 2. CONTINUATION OF INSURANCE.

(a) After Acquisition of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or interest in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage; (ii) a transferee of the insured

(Continued on inside back cover)

CONDITIONS AND STIPULATIONS
(Continued from inside front cover)

mental agency or governmental instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage.

(b) **After Conveyance of Title.** The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

(c) **Amount of Insurance:** The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:

(i) the Amount of Insurance stated in Schedule A;

(ii) the amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) the amount paid by any governmental agency or governmental instrumentality, if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

**3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.**

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest or the lien of the insured mortgage, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

**4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.**

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

**5. PROOF OF LOSS OR DAMAGE.**

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

**6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**

In case of a claim under this policy, the Company shall have the following options:

(a) To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i) to pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay; or

(ii) to purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of purchase and which the Company is obligated to pay.

If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage, together with any collateral security, to the Company upon payment therefor.

Upon the exercise by the Company of either of the options provided for in paragraphs a(i) or (ii), all liability and obligations to the insured under this policy, other than to make the payment required in those paragraphs, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs b(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

**7. DETERMINATION AND EXTENT OF LIABILITY.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

(ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations or has con-

(Continued on back)

## CONDITIONS AND STIPULATIONS

(continued from inside back cover)

veyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

**8. LIMITATION OF LIABILITY.**

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

(d) The Company shall not be liable for:

(i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expended to prevent deterioration of improvements; or

(ii) construction loan advances made subsequent to Date of Policy, except construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the land which at Date of Policy were secured by the insured mortgage and which the insured was and continued to be obligated to advance at and after Date of Policy.

**9. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of the indebtedness secured by the insured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

**10. LIABILITY NONCUMULATIVE.**

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage hereafter executed by the insured or assumed or agreed to by the insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

**11. PAYMENT OF LOSS.**

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

**12. SUBROGATION UPON PAYMENT OR SETTLEMENT.**

(a) **The Company's Right of Subrogation.**

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to all rights and remedies of the insured claimant after the insured claimant shall have recovered its principal, interest, and costs of collection.

(b) **The Insured's Rights and Limitations.**

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(c) **The Company's Rights Against Non-insured Obligors.**

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a)(ii) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

**13. ARBITRATION.**

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

**14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.**

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

**15. SEVERABILITY.**

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

**16. NOTICES, WHERE SENT.**

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company at 10 Post Office Square, Boston, Massachusetts 02109, or to the office which issued this policy.

## LOAN POLICY

### SCHEDULE A

| | POLICY NUMBER | DATE OF POLICY | AMOUNT OF INSURANCE |
|---|---|---|---|
| Owner | N/A | | |
| Loan | 50126168 | March 1, 1989 at 11:06 A.M. | $406,000.00 |

☐ Please check box if above loan policy is a prior First American Title Insurance Policy in the amount of $_____

1.  Name of Insured: Vanguard Bank, its successors and assigns

2.  The estate or interest referred to herein is at Date of Policy vested in:

    Leo Shapiro, Harvey Altholtz and Donald Smith d/b/a Victorian Heights Associates

3.  The estate or interest in the land described in this Schedule and which is encumbered by the insured mortgage is Fee Simple.

4.  The mortgage, herein referred to as the insured mortgage, and the assignment thereof, if any, are described as follows:

    Mortgage from Leo Shapiro, Harvey Altholtz and Donald Smith d/b/a Victorian Heights Associates to Vanguard Bank dated March 1, 1989 in the original amount of $406,000.00 recorded in Hampden County Registry of Deeds as Document No. 11315.

5.  The land referred to in this policy is located at: 41-43 Maple, 15.763 acres, more or less, _____ Street

    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

    in the City/Town of _____ Wilbraham _____, County of _____ Hampden _____,

    State of _____ Massachusetts _____ and is described as set forth in exhibit "A"

    attached hereto and made a part hereof.

AUTHORIZED SIGNATURE

TYPE AGENT'S OR FIRM'S NAME

Draymore, Rosenbloom & Draymore
95 State Street - Suite 513
Springfield, MA 01103

ADDRESS

First American Title Insurance Company          This policy valid only if Schedule B is attached.          LO/A

# LOAN POLICY

## SCHEDULE B

Policy Number __N/A__
OWNERS

Policy Number __5012616B__
LOAN

This policy does not insure against loss or damage by reason of the following:

1. Any facts, rights, interests, or claims which are not shown by the public records, but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.

2. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

3. Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by a law and not shown by the public records.

4. The mortgage, if any, referred to in item 4 of Schedule A. (This exception does NOT apply to Loan Policies.)

5. Real Estate taxes and municipal charges which constitute liens, but which are not yet due and payable; provided, however, that said taxes and municipal charges have been paid through December 31, 1988.

6. Driveway easement dated August, 1987 as shown on plan recorded with Hampden County Registry of Deeds in Plan Book 252, Page 37 and as described in instrument dated October 15, 1987 recorded as aforesaid in Book 6555, Page 166.

The following are applicable only if checked:

[X] Exception number 1 is hereby omitted from the loan and owner's policies.

[X] Exception number 2 is hereby omitted from the loan policy only based on:
☐ mortgage plot plan    [X] full instrument survey    ☐ residential mortgage survey affidavit    ☐ condominium site plan/unit plan

[X] Exception number 3 is hereby omitted from the loan and owner's policies.
(The above sub-block information is for internal company use only and does not form a part of the policy.)

INITIAL FOR IDENTIFICATION
6/03

MAR-08-2005 10:40 From:                    To:5235596692                    P.5/40

## LOAN POLICY

### SCHEDULE B, PART II

Policy Number __N/A__
(Owner)

Policy Number __5012616B__
(Loan)

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, but the Company insures that such matters are subordinate to the lien or charge of the insured mortgage upon said estate or interest:

1)  Collateral Assignment of Rents and Leases from Victorian Heights Associates to Vanguard Savings Bank dated February 28, 1989, and recorded in Hampden County Registry of Deeds as Document No. 11316.

2)  UCC Financing Statement from Leo J. Shapiro to Vanguard Savings Bank recorded in Hampden County Registry of Deeds as Document No. 11317.

3)  UCC Financing Statement from Harvey Altholtz to Vanguard Savings Bank recorded in Hampden County Registry of Deeds as Document No. 11318.

4)  UCC Financing Statement from Donald Smith to Vanguard Savings Bank recorded in Hampden County Registry of Deeds as Document No. 11319.

INITIAL FOR IDENTIFICATION

*First American Title Insurance Company*



# EXHIBIT A

A certain parcel of land in Wilbraham, Hampden County, Massachusetts, said parcel being known and designated as Parcel "B" as shown on a plan entitled "Plan of Land Maple St., Mountain Rd., & Bartlett Ave, Wilbraham, Mass. Owned by Byron I. & Ethel Musselman," dated August , 1987 and recorded with Hampden County Registry of Deeds in Plan Book 253, Page 72, said parcel being more particularly bounded and described as follows:

Beginning at a point on the southerly sideline of Maple Street, thence running N. 78° 29' 52" E., a total distance of three hundred thirteen and 26/100 (313.26) feet along the southerly sideline of Maple Street to a point; thence turning and running S. 8° 18' 08" E., two hundred and 22/100 (200.22) feet along land now or formerly of Baldwin to a point; thence turning and running N. 66° 14' 54" E., a total distance of two hundred forty-five and 45/100 (245.45) feet along last-named land and land now or formerly of Manning to an iron pin; thence turning and running S. 88° 01' 47" E., one hundred two and 00/100 (102.00) feet along land now for formerly of Manning to a point; thence turning and running S. 4° 27' 57" W., three hundred nineteen and 10/100 (319.10) feet along land now or formerly of Rhie to an iron pin; thence turning and running S. 87° 33' 00" E., two hundred sixty-seven and 30/100 (267.30) feet along last-named land to an iron pin; thence turning and running S. 2° 09' 49" W., sixty-seven and 53/100 (67.53) feet along land now or formerly of Carpenter to an iron pin; thence turning and running N. 79° 07' 48" E., two hundred ninety-eight and 85/100 (298.85) feet along last-named land to an iron pin; thence turning and running S. 00° 44' 00" W., one hundred fifty and 91/100 (150.91) feet along the westerly side of Bartlett Avenue to a stone bound; thence turning and running S. 79° 08' 07" W., three hundred two and 71/100 (302.71) feet along land now or formerly to Stebbins to an iron pin; thence turning and running S. 2° 09' 49" W., one hundred four and 44/100 (104.44) feet along last-named land to an iron pin; thence turning and running S. 81° 12' 40" W., six hundred thirty-three and 26/100 (633.26) feet along land now or formerly of Cordner to a point; thence turning and running S. 6° 37' 04" W., two hundred ninety-seven and 65/100 (297.65) feet along last-named land to a point; thence turning and running S. 72° 33' 02" W., one hundred thirty-five and 27/100 (135.27) feet along last-named land to a point; thence turning and running N. 12° 31' 21" W., six hundred twenty-two and 00/100 (622.00) feet along land now or formerly of Sibilia et al to an iron pin; thence turning and running N. 10° 59' 44" W., three hundred two and 39/100 (302.39) feet along land now or formerly of Czepukaitis to a point; thence turning and running N. 78° 29' 52" E., one hundred sixty-seven and 00/100 (167.00) feet along Parcel "A" as shown on said plan to a point; thence turning and running N. 10° 59' 44" W., one hundred eight and 00/100 (108.00) feet along last-named land to a point; thence turning and running N. 32° 58' 27" W., ninety-eight and 86/100 (98.86) feet along last-named land to a point, the point of beginning.

Containing 686,667 square feet of land according to said plan.

Reserving to the grantors herein, their heirs, executors, administrators, and assigns the right to pass and repass, by foot or vehicle, over a parcel of land shown as "Driveway Easement" on said plan, and to allow utilities servicing the premises described as Parcel A to traverse said parcel, said parcel being more particularly bounded and described as follows:

Beginning at a point on the southerly sideline of Maple Street, thence running N. 78° 29' 52" E., thirty-seven and 00/100 (37.00) feet along the southerly sideline of Maple Street to a point; thence turning and running S. 10° 59' 44" E., ninety-two and 00/100 (92.00) feet to a point; thence turning and running N. 32° 58' 27" W., ninety-eight and 86/100 (98.86) feet along Parcel "A" as shown on said plan to a point, the point of beginning.

M R S D

## *First American Title Insurance Company*

**MASTER ENDORSEMENT**

Attached to and forming part of Loan Policy No. _501261A8_ of FIRST AMERICAN TITLE
INSURANCE COMPANY, insuring property located at 41-43 Maple Street, Wilbraham, MA
and issued to _Vanguard Bank_

The following coverage, as checked, is hereby given with respect to the aforementioned policy to the
same extent as if the endorsement checked was attached to said policy:

- ☐ ALTA 4 - Condominium Endorsement
- ☐ ALTA 5 - PUD Endorsement
- ☒ ALTA 6 - Variable Rate Mortgage Endorsement
- ☐ ALTA 6.2 - Negative Amortization Endorsement
- ☐ ALTA 8 - Environmental Lien Endorsement (1987 POLICIES ONLY)
- ☒ ALTA 8.1 - Environmental Lien Endorsement (ALL POLICIES)
- ☐ OTHER: Please Specify _____

NOTE:   FULL COPIES OF THESE ENDORSEMENTS ARE AVAILABLE UPON REQUEST

This Endorsement shall not be valid or binding until countersigned by an authorized signatory as
designated below.

Signed and sealed this    1st    day of    March    , 19 89

FIRST AMERICAN TITLE INSURANCE COMPANY

BY _____ PRESIDENT

BY _____ ASSISTANT SECRETARY

COUNTERSIGNED:

BY: _____

# Robert H. Greene, Esq.

*Attorney at Law*

1135 North Main Street
Brockton, MA 02301
Telephone (508) 588-7729
FAX (508) 559-6692
rgreene550@aol.com

March 30, 2005

First American Title Insurance Company
1 Monarch Place
Suite 1120
Springfield MA 01103

ATTENTION:        **STEPHEN M. LEECOCK, ASSISTANT BRANCH COUNSEL**

RE:    **PREMISES AT PATRIOT RIDGE LANE, WILBRAHAM MA**
       **CONVEYANCE FROM ROCKY COAST, LLC TO CHARLES RICHARD**

Dear Attorney Leecock:

Pursuant to our telephone conversation earlier this morning, I have again analyzed the various documents of record and consulted with our title examiner. In light of the following I suggest that title is, in fact, "clear" and we have accounted for any ownership interest that Joseph V. Baldwin may have ever had in the subject property.

1.    JOSEPH W. BALDWIN died on November 11, 1942, with a Will (and probate) wherein he devised his property, which included the subject property, in four shares to his three sons JOSEPH J. BALDWIN, WILLIAM V. BALDWIN, JOHN F. BALDWIN (the elder) and a granddaughter LOYOLA WEEKS KEATING, for whom the son JOSEPH J. BALDWIN was appointed Trustee (in addition to his appointment as Executor under the Will);

2.    By Deed dated May 1, 1945 (Book 1837 Page 1), JOSEPH J. BALDWIN, WILLIAM V. BALDWIN and JOSEPH J. BALDWIN as Executor and Trustee under the Will of John W. Baldwin, for the benefit of Loyola Weeks, conveyed the property to the other son/devisee JOHN F. BALDWIN (the elder);
       *John*

3.    JOSEPH F. BALDWIN (the elder) held sole title to the property until his death on January 10, 1947.
       *John*

4.    JOSEPH F. BALDWIN (the elder) died intestate on January 10, 1947, survived by his
wife RUBY S. BALDWIN and sons JOHN F. BALDWIN (the younger) and JOSEPH V.
BALDWIN.

5.    Consequently, at that time the wife RUBY S. BALDWIN shared ownership of the
property- in whatever proportionate share the Massachusetts intestacy laws provided at
that time for a surviving spouse- with the sons JOHN F. BALDWIN (the younger) and
JOSEPH V. BALDWIN equal owners of the remaining proportionate share for the
"children" of the deceased [NOTE: I believe until 1976 the surviving spouse inherited one-
third of the property and the children two thirds].

6.    There is a Deed of record dated August 1, 1958 (Book 2633 Page 41) from WILLIAM V.
BALDWIN, **JOSEPH V. BALDWIN,** and LOYOLA KEATING to JOHN F.
BALDWIN (the younger) conveying the property described as "All and singular the real
estate of record in said Hampden County now belonging to John W. Baldwin, late of said
Wilbraham, not previously conveyed or devised."

7.    MY ANALYSIS OF THE DEED OF AUGUST 1, 1958 IS AS FOLLOWS:
Because the Deed could not have referred to any other land other than the subject
property and any ownership interest of JOSEPH V. BALDWIN in the property did not
come into existence until the intestate death of his father JOHN F. BALDWIN (the elder)
on January 10, 1947, there could be no other reason nor purpose for the Deed other than
intent of JOSEPH V. BALDWIN to convey his ownership interest in the property to his
brother JOHN F. BALDWIN (the younger); JOSEPH V. BALDWIN could not have
executed such a Deed prior to the death of his father on January 10, 1947 as he had no
interest in the property prior to that event. In light of this Deed, I suggest that there is no
risk that any heirs or next of kin of this Joseph V. Baldwin could ever present even a
colorable claim that Joseph had any ownership in the property thereafter.

8.    By Deed dated June 16, 1955 (Book 2398 Page 334?- copy attached), RUBY S.
BALDWIN conveys all of the property in her name in Hampden County to RUBY S.
BALDWIN and her son JOHN F. BALDWIN (the younger) AS JOINT TENANTS- upon
this event the proportionate share of the property that RUBY S. BALDWIN inherited
from JOHN F. BALDWIN (the senior) would be halved, and her other half share would
be owned by JOHN F. BALDWIN (the younger) who would also continue to own his
original share inherited from JOHN F. BALDWIN (the elder);

9.    RUBY S. BALDWIN died on February 4, 1970, unmarried, thus predeceasing her son
JOHN F. BALDWIN (the younger), who died on November 23, 1993) there is no probate
of record for Ruby S. Baldwin (she died in Palmer, Massachusetts, a
resident of Wilbraham);

PAGE 3/ GREENE TO FIRST AMERICAN- LEBCOCK          MARCH 30, 2005

10.    JOHN F. BALDWIN (the younger) then conveys the property to Musselman by deed dated August 28, 1979 (Book 4823 Page 133), leading in the chain of title to my client.

In light of the above, I suggest that title is "clear" and that such a conclusion is consistent with the apparent conclusion of First American when it issued the Lender's Policy to my client's predecessor in interest, Vanguard Bank, on March 1, 1989 (Policy No. 50126168).

Please consult with Attorney Mirkin to determine whether First American can now issue the requested owner's policy of title insurance to his client.

Very truly yours:

ROBERT H. GREENE

RHG/rhg

FAXED ONLY TO 413 733-5816 ON MARCH 30, 2005

CC:

Bacon & Wilson, PC
33 State Street
Springfield MA 01103

ATTENTION:          FRANCIS R. MIRKIN, ESQ.

FAXED ONLY TO 413 739-7740 ON MARCH 30, 2005

# Robert H. Greene, Esq.

*Attorney at Law*

*1135 North Main Street*
*Brockton, MA 02301*
*Telephone (508) 588-7729*
*FAX (508) 559-6692*
rgreene550@aol.com

March 30, 2005

First American Title Insurance Company
1 Monarch Place
Suite 1120
Springfield MA 01103

ATTENTION:     **STEPHEN M. LEECOCK, ASSISTANT BRANCH COUNSEL**

RE:     **PREMISES AT PATRIOT RIDGE LANE, WILBRAHAM MA**
**CONVEYANCE FROM ROCKY COAST, LLC TO CHARLES RICHARD**

Dear Attorney Leecock:

After I prepared and faxed out my earlier letter of today, I realized there were several errors with some of the names.  Please correct my previous letter as follows:

1.   In Paragraph 1, the first name appearing therein should be changed from "JOSEPH W. BALDWIN" to "JOHN W. BALDWIN."

2.   In Paragraph 3, the name should be changed from "JOSEPH F. BALDWIN" to "JOHN F. BALDWIN."

3.   In Paragraph 4, the first name appearing therein should be changed from "JOSEPH F. BALDWIN" to " JOHN F. BALDWIN."

Very truly yours:  ·

ROBERT H. GREENE

RHG/rhg
FAXED ONLY TO 413 733-5816 ON MARCH 30, 2005– 2nd Fax of Day
CC:
Bacon & Wilson, PC
33 State Street
Springfield MA 01103

ATTENTION:     **FRANCIS R. MIRKIN, ESQ.**

FAXED ONLY TO 413 739-7740 ON MARCH 30, 2005– 2nd Fax of Day

# Robert H. Greene, Esq.

*Attorney at Law*

*1135 North Main Street*
*Brockton, MA 02301*
*Telephone (508) 588-7729*
*FAX (508) 559-6692*
*rgreene550@aol.com*

April 5, 2005

First American Title Insurance Company
1 Monarch Place
Suite 1120
Springfield MA 01103

**ATTENTION:**          **STEPHEN M. LEECOCK, ASSISTANT BRANCH COUNSEL**

**RE:**          **PREMISES AT PATRIOT RIDGE LANE, WILBRAHAM MA**
          **CONVEYANCE FROM ROCKY COAST, LLC TO CHARLES RICHARD**

Dear Attorney Leecock:

Pursuant to the request of Attorney Mirkin, the following is a chronology of events regarding the above property:

1.    Until his death on November 11, 1942, JOHN W. BALDWIN was the owner of the locus;

2.    JOHN W. BALDWIN left a Will (with probate at the Hampden County Probate Court)
wherein he devised the property , in four shares to his three sons JOSEPH J. BALDWIN,
WILLIAM V. BALDWIN and JOHN F. BALDWIN (whom we call the "elder"), and a
granddaughter LOYOLA WEEK KEATING- the son JOSEPH J. BALDWIN was
appointed both the Executor under the Will and as Trustee for Loyola Weeks Keating
(who may have been a minor at the time the Will was prepared);

3.    By Deed dated may 1, 1945 (Book 1837 Page 1), JOSEPH J. BALDWIN, WILLIAM V.
BALDWIN and JOSEPH J. BALDWIN, as Executor and Trustee under the Will of JOHN
W. BALDWIN, for the benefit of Loyola Weeks, conveyed the property to the other
son/devisee JOHN F. BALDWIN (the elder)- AT THIS POINT THE TOTAL
OWNERSHIP INTEREST OF THE PROPERTY VESTS IN THIS JOHN F. BALDWIN
(the "elder");

PLEASE DELIVER TO ATTORNEY MIRKIN

PAGE 2                                                   APRIL 5, 1005

4.  JOHN F. BALDWIN (the elder) held sole title to the property until his death on January 10, 1947- HE DIED INTESTATE (probate on file at Hampden County Probate Court) survived by his wife RUBY S. BALDWIN and two sons JOHN F. BALDWIN (the "younger") and JOSEPH V. BALDWIN.

5.  Consequently, upon the death of JOHN F. BALDWIN (the elder), the wife RUBY S. BALDWIN shared ownership of the property in the applicable statutory share (which I believe at that time was 1/3 for the surviving spouse and 2/3 for children) with the two sons JOHN F. BALDWIN (the "younger") and JOSEPH V. BALDWIN.

6.  By Deed dated June 16, 1955 (Book 2398 Page 334?), RUBY S. BALDWIN conveyed all of her property in her name in Hampden County to RUBY S. BALDWIN and her son JOHN F. BALDWIN (the younger) "AS JOINT TENANTS";

7.  By Deed dated August 1, 1958 (book 2633 Page 41), JOSEPH V. BALDWIN, WILLIAM V. BALDWIN, and LOYOLA KEATING convey to JOHN F. BALDWIN (the younger) property described as, "All and singular the real estate of record in said Hampden County, now belonging to John W. Baldwin, late of said Wilbraham, not previously conveyed or devised");

8.  RUBY S. BALDWIN died on February 4, 1970, unmarried, thus predeceasing her son JOHN F. BALDWIN (the younger), who died on November 23, 1993)- there is no probate of record for RUBY S. BALDWIN (she died in Palmer, in Hampden County Massachusetts, a resident of Wilbraham);

9.  Assuming that by the Deed dated August 1, 1958 (Paragraph 7 above) JOSEPH V. BALDWIN conveyed all of his interest in the property to his brother JOHN F. BALDWIN (the younger), then upon the death of the joint tenant RUBY S. BALDWIN on February 4, 1970, JOHN F. BALDWIN (the younger) would have owned the entire locus at the time of his Deed of August 28, 1979 (Book 4823 Page 133) to Musselman, which leads to my client's chain of title.

I note the following for the Deed of August 1, 1958:

Because the Deed could not have referred to any other land other than the ownership interest of JOSEPH V. BALDWIN in the property, and his rights in the property did not come into existence until the death of his father JOHN F. BALDWIN (the elder) on January 10, 1947, there is no other explanation for the Deed.

Very truly yours:

ROBERT H. GREENE

# *Robert H. Greene, Esq.*

*Attorney at Law*

*1135 North Main Street*
*Brockton, MA 02301*
*Telephone (508) 588-7729*
*FAX (508) 559-6692*
rgreene550@aol.com

April 5, 2005

Bacon & Wilson, PC
33 State Street
Springfield MA 01103

ATTENTION:    **FRANCIS R. MIRKIN, ESQ.**

RE:    PREMISES AT PATRIOT RIDGE LANE, WILBRAHAM MA
        CONVEYANCE FROM ROCKY COAST, LLC TO CHARLES RICHARD
        TITLE ISSUES

Dear Attorney Mirkin:

As I communicated to Attorney Leecock and your office on March 30, 2005, it is the position of Rocky Coast, LLC that the Deed from Joseph V. Baldwin et al to John F. Baldwin (the younger) dated August 1, 1958 (Book 2633 Page 41) accounts for any and all ownership interest of Joseph V. Baldwin in the property and, therefore, there exist no significant title impediments.

My client has directed and authorized my office to advise that unless there is a commitment to proceed to "closing" by Charles Richard some time today, that my client will assume that notwithstanding the above that Mr. Richard still refuses to accept a Deed and complete the conveyance of the property on account of the purported title issue, and Rocky Coast, LLC will thereupon consider the Purchase & Sale Agreement between the parties to be of no further force nor effect, and Rocky Coast, LLC will thereafter locate another purchaser of the property.

Very truly yours:

ROBERT H. GREENE

RHG/rhg
FAXED ONLY TO 413 739-7740 ON APRIL 5, 2005

# *Robert H. Greene, Esq.*

*Attorney at Law*

*1135 North Main Street*
*Brockton, MA 02301*
*Telephone (508) 588-7729*
*FAX (508) 559-6692*
rgreene550@aol.com

April 6, 2005

Bacon & Wilson, PC
33 State Street
Springfield MA 01103

ATTENTION:    **FRANCIS R. MIRKIN, ESQ.**

RE:    PREMISES AT PATRIOT RIDGE LANE, WILBRAHAM MA
       CONVEYANCE FROM ROCKY COAST, LLC TO CHARLES RICHARD

Dear Attorney Mirkin:

Having received no response from your office as to my previous inquiries regarding my client's position as to the status of title to the property and a demand for a conveyance, my client has directed my office to advise that Rocky Coast, LLC now considers the Purchase & Sales Agreement between the parties of February 17, 2005 to be of no further force nor effect. Any deposits previously delivered by the Mr. Richard may be returned to the buyer.

I further advise that Rocky Coast, LLC will now attempt to locate another buyer for for the property who will be willing accept title to the property in the same status or condition as the title was presented to and offered to Mr. Richards.

Very truly yours:

ROBERT H. GREENE

RHG/hg
OVERNIGHT MAIL- UPS
FAXED TO 413 739-7740 AND MAILED FIRST CLASS MAIL ON APRIL 6, 2005

## BACON & WILSON P.C.

ATTORNEYS AT LAW

MICHAEL S. RATNER
PAUL A. SAVAGE
GARY L. FIALKY
MICHAEL R. KATZ
PAUL L. ROTHSCHILD
STEPHEN N. KREVALIN
HYMAN G. DARLING
MARK J. BEGLANE
GARY G. BRETON
MICHAEL J. COYNE
KENNETH J. ALBANO
RICHARD A. COBERT
ROBERT S. MURPHY, JR.
PHILIP R. SMITH
FRANCIS R. MIRKIN
DONNA L. WEXLER
MICHELLE M. BEGLEY*
MARTIN O. DUNN
JULIE A. DIALESSI-LAFLEY*
GINA M. BARRY*
JUSTIN H. DION*
BENJAMIN M. COYLE
ADAM J. BASCH*
JAY A. ENRIGHT
TODD D. RATNER
BRETT A. KAUFMAN
HARLEY K. SACKS**
MARK A. TANNER*
*ADMITTED ALSO IN CT
**ADMITTED ALSO IN NY
OF COUNSEL:
ELIZABETH A. GINTER
RETIRED
PHILIP C. SMITH
JAMES M. SWEENEY
GEORGE A. BACON
(1898-1964)
PETER H. WILSON
(1908-1989)
JUSTIN COHEN
(1913-1987)
A. GABRIEL
(1960-2004)

33 STATE STREET
SPRINGFIELD, MA 01103-2003
TELEPHONE (413) 781-0560
FAX (413) 739-7740

9 CHAPEL STREET
WESTFIELD, MA 01085-3009
FAX (413) 562-0548
TELEPHONE (413) 562-6611

31 TRUMBULL ROAD
NORTHAMPTON, MA 01060-3036
FAX (413) 584-0453
TELEPHONE (413) 584-1287

www.bacon-wilson.com

April 11, 2005

Via Telecopier-508-559-6692
Robert H. Greene, Esquire
1135 North Main Street
Brockton, MA 02401

RE:    *Purchase of Patriot Ridge Lane Subdivision, Wilbraham, MA*

Dear Robert:

This will acknowledge receipt of your letter of April 6, 2005.

As you know, since this title issue presented itself, you and I attempted to have our respective title examiners try to determine ways to try to resolve this matter. Additionally, we forwarded a copy of our findings to a local title insurer for its review. I have since discussed this title at length with legal representatives of the title insurer, as have you. While it is likely that they would be able to effectively insure over the issues pertaining to the death of Ruby Baldwin, they are unable to overcome the documented infirmities in the deed dated August 1, 1958 regarding the interest of Joseph V Baldwin. That document contains ambiguities and inaccuracies that they conclude constitute a serious flaw and likely what is likely to be a fatal problem for a proposed sale now or in the future.

Based upon our discussions, you developed a proposed corrective action to rectify this matter. First American Title Insurance Company was in agreement with the approach set forth in your letter of March 15, 2005 and e-mail of March 16, 2005. It appears that based upon the perceived risk of unsuccessful curative action, that your client has required you to terminate the agreement of the parties. It is our position that your referenced proposal was the only way to deal with this title defect. It is well established that every contract carries with it a duty of good faith. It is our position that your client's unwillingness to research a possible title remedy, constitutes bad faith on its part. Additionally, its expressed intent to try to sell this property to another party would, in my opinion, compound your client's liability, in the absence of detailed disclosure of the problems with this title.

Page 2

I appreciate you client's frustration; however, there is a substantial likelihood that Ellis Title will be called upon to examine the title to the property in the future. If that occurs, then they will have an obligation to present their findings and potentially impact the sale of all of the lots collectively and or singularly. Our examiner, your examiner, and counsel for the title insurance company have tried their best to analyze (as you have tried to do) a way to erase the issues surrounding marketability, without success.

My client expended a significant amount of money on due diligence at the site. Mr. Richard has proceeded in good faith. Although I think you have made a strong advocate's effort to convince all parties of the marketability of this title, I am unable to find support for the positions you have taken with the exception of the proposed action set forth in your correspondence of mid-March. Based upon all of the foregoing, even if my client decides to accept the return of its deposit, he must reserve all of his rights and remedies arising out of your client's breach of its contractual obligations, including requiring you to specifically perform under the terms of the contract. Solely for the purpose of settlement, I am suggesting that if your client will not make a good faith effort to take the action required to rectify this matter, then we discuss a global settlement of this issue and seek to compensate my client for actual out of pocket damages.

Very truly yours,

Francis R. Mirkin

FRM/laf
361935

cc:   Charles Richard

# Robert H. Greene, Esq.

*Attorney at Law*

*1135 North Main Street*
*Brockton, MA 02301*
*Telephone (508) 588-7729*
*FAX (508) 559-6692*
rgreene550@aol.com

April 12, 2005

Bacon & Wilson, PC
33 State Street
Springfield MA 01103

ATTENTION:       **FRANCIS R. MIRKIN, ESQ.**

RE:       PREMISES AT PATRIOT RIDGE LANE, WILBRAHAM MA
CONVEYANCE FROM ROCKY COAST, LLC TO CHARLES RICHARD

Dear Attorney Mirkin:

In response to your fax letter of April 11, 2005, my client has directed my office to communicate the following:

1.   My client and my office conclude that although  the Deed of August 1, 1958 from Joseph V. Baldwin et al to John F. Baldwin (the younger) might be somewhat confusing (particularly if one is unaware of the context of the Deed when construed in light of other instruments of record), that it is not ambiguous- notwithstanding a handwritten comment in the margin of a copy of the Deed written by, I believe, your title examiner that "I think this is an uncle", this grantor Joseph V. Baldwin is undoubtedly the same Joseph V. Baldwin who was the son of John F. Baldwin (the elder) and the brother of John F. Baldwin (the younger)- please note in the Deed that it is also executed by"Marie Baldwin, wife of said Joseph V."- as we have previously informed, Joseph V. Baldwin was married to Marie Baldwin, his surviving spouse when Joseph Baldwin died in 2002;

2.   With regard to the language in the Deed"now belonging to John W. Baldwin, late of said Wilbraham, not previously conveyed or devised, as we have previously informed," the rights of Joseph V. Baldwin in the property did not vest until his father John F. Baldwin (the elder) died in 1947- therefore, Joseph V. Baldwin had not previously conveyed or devised **HIS** ownership interest in the property;

PAGE 2/ GREENE TO MIRKIN    APRIL 12, 2005

3.   The August 1, 1958 Deed in question was not brought to my attention until after your title
     examiner completed her initial title search and issued her report of March 4, 2005 with its
     conclusions therein- after issuance of this report of March 4, 2005, I believe that I
     suggested that the title examiners obtain copies of any and all deeds ever executed by
     Joseph V. Baldwin of record at the Hampden Registry ( I found it difficult to accept that
     when John F. Baldwin (the younger) executed his Deed to Musselman in 1979 that he
     could possibly have had any belief that he owned less than the total interest in the
     property);

4.   Rocky Coast, LLC, does intend to render a full disclosure of any and all circumstances
     pertaining to title to any and all potential buyers;

5.   I respectfully suggest that if another buyer accepts title as marketable in its present
     condition and status, and a title insurer, First American Title Insurance or otherwise,
     concurs with that conclusion and so issues a title policy, that Mr. Richard could hardly
     find any fault with my client on account of his rejection of title which my client offered, a
     rejection which my client considers unjustified.

Very truly yours;

ROBERT H. GREENE

RHG/rhg
FAXED ONLY TO 413 739-7740 ON APRIL 12, 2005

# Robert H. Greene, Esq.
*Attorney at Law*

*1135 North Main Street*
*Brockton, MA 02301*
*Telephone (508) 588-7729*
*FAX (508) 559-6692*
*rgreene550@aol.com*

April 6, 2005

CATIC
40 Williams Street, Suite G90
Wellesley MA 02481

ATTENTION:        **LYNNE MURPHY BREEN, ESQ.,**
**Title Counsel**

RE:        PREMISES AT BARTLETT AVENUE AND MAPLE STREET, WILBRAHAM MA
PATRIOT RIDGE FLEXIBLE SUBDIVISION
ROCKY COAST LLC

Dear Attorney Breen:

A client, the owner of the above property (recently subdivided land), has requested a determination as to whether CATIC could issue an owner's title policy (and probably a lender's policy) regarding the property. During the course of attempting to convey the property a disagreement arose between title examiners and, to some extent, certain attorneys, as to whether title was "clear." After applying considerable time to analysis of the title and arranging for our title examiner to conduct additional research at the Hampden Registry of Deeds and Probate Court, I have concluded that title is "clear."

The chronology of events is as follows:

1.     JOHN W. BALDWIN died on November 11, 1942, with a Will (and probate on file) wherein he devised his property, which included the subject property, in four shares to his three sons JOSEPH J. BALDWIN, WILLIAM V. BALDWIN, JOHN F. BALDWIN whom we call the "elder") and a granddaughter LOYOLA WEEKS KEATING, for whom the son JOSEPH J. BALDWIN was appointed Trustee (in addition to his appointment as Executor under the Will);

PAGE 2/ GREENE TO BREEN                                    APRIL 7, 2005

2.    By Deed dated May 1, 1945 (Book 1837 Page 1), JOSEPH J. BALDWIN, WILLIAM V.
      BALDWIN and JOSEPH J. BALDWIN as Executor and Trustee under the Will of John
      W. Baldwin, for the benefit of Loyola Weeks, conveyed the property to the other
      son/devisee JOHN F. BALDWIN (the elder) [copy attached];

3.    JOHN F. BALDWIN (the elder) held sole title to the property until his death on January
      10, 1947;

4.    When JOHN F. BALDWIN (the elder) so died intestate on January 10, 1947, (probate on
      file) he was survived by his wife RUBY S. BALDWIN and two sons JOHN F. BALDWIN
      (the younger) and JOSEPH V. BALDWIN;

5.    Consequently, upon the death of the elder JOHN F. BALDWIN his wife RUBY S.
      BALDWIN shared ownership of the property- in whatever proportionate share the
      Massachusetts intestacy laws provided at that time for a surviving spouse- with the sons
      JOHN F. BALDWIN (the younger) and JOSEPH V. BALDWIN as equal owners of the
      remaining proportionate share for the "children" of the deceased [NOTE: I believe until
      1976 the surviving spouse inherited one-third of the property and the children two thirds];

6.    By Deed dated June 16, 1955 (Book 2398 Page 334?- copy attached), RUBY S.
      BALDWIN conveyed all of the property in her name in Hampden County to RUBY S.
      BALDWIN and her son JOHN F. BALDWIN (the younger) "AS JOINT TENANTS"-
      upon this event the proportionate share of the property that RUBY S. BALDWIN
      inherited from JOHN F. BALDWIN (the elder) would be shared as a joint tenant with her
      son JOHN F. BALDWIN (the younger), who would also continue to own his original
      share inherited from JOHN F. BALDWIN (the elder), and JOSEPH V. BALDWIN still
      owned the share he inherited from his father;

7.    There is a Deed of record dated August 1, 1958 (Book 2633 Page 41) from WILLIAM V.
      BALDWIN, **JOSEPH V. BALDWIN**, and **LOYOLA KEATING** to **JOHN F.
      BALDWIN** (the younger) conveying the property described as "All and singular the real
      estate of record in said Hampden County now belonging to John W. Baldwin, late of said
      Wilbraham, not previously conveyed or devised."

8.    MY ANALYSIS OF THE DEED OF AUGUST 1, 1958 IS AS FOLLOWS:
      Because this Deed could not have referred to any other land other than the subject
      property and any ownership interest of JOSEPH V. BALDWIN in the property did not
      vest or come into existence until the intestate death of his father JOHN F. BALDWIN (the
      elder) on January 10, 1947, there could be no other reason nor purpose for the Deed other
      than intent of JOSEPH V. BALDWIN to convey his ownership interest in the property to
      his brother JOHN F. BALDWIN (the younger); JOSEPH V. BALDWIN could not have
      executed such a Deed prior to the death of his father on January 10, 1947 as he had no

PAGE 3/ GREENE TO BREEN                                    APRIL 7, 2005

interest in the property prior to that event. In light of this Deed, I suggest that there is no risk that any heirs or next of kin of this Joseph V. Baldwin could ever present even a colorable claim that Joseph had any ownership in the property thereafter.

9.    RUBY S. BALDWIN died on February 4, 1970, unmarried, thus predeceasing her son JOHN F. BALDWIN (the younger), who died on November 23, 1993; and there is no probate of record for Ruby S. Baldwin in Hampden County (she died in Palmer, Massachusetts, a resident of Wilbraham);

10.   JOHN F. BALDWIN (the younger) then conveyed the property to a Musselman by deed dated August 28, 1979 (Book 4823 Page 133), leading in the chain of title to my client.

One title examiner had concerns as to the intestate interest that JOSEPH V. BALDWIN had obtained upon the death of his father JOHN F. BALDWIN (the elder) and applying a very technical reading of the Deed from JOSEPH V. BALDWIN et all dated August 1, 1958 (described in Paragraphs 7 and 8 above), felt that his ownership interest in the property had still not been accounted for- apparently the title examiner was concerned with the language "...not previously conveyed or devised." As I point out above, although other persons had previously conveyed their respective interest in the property originally belonging to JOHN W. BALDWIN and his estate, the August 1, 1958 deed was the first occasion when JOSEPH V. BALDWIN conveyed his ownership interest in the property.

Please advise if CATIC would have any reservations regarding issuance of a title insurance policy regarding the above.

Very truly yours:

ROBERT H. GREENE

RHG/rhg

FAXED ONLY TO 781 237-8775 ON APRIL 7, 2005

April 12, 2005

Robert H. Greene, Esquire
1135 North Main Street
Brockton, MA 02301

RE:  Bartlett Avenue and Maple Street, Wilbraham

Dear Attorney Greene:

Thank you for forwarding the very interesting title question on the above-captioned property. Lynne and I enjoyed discussing the issues that were raised, and agree with you that the title is clear.

You may issue an owner's policy without exception for a missing interest in Joseph V. Baldwin. The deed recorded with the Hampden District Registry of Deeds in Book 2633 Page 41 conveys any remaining interest in property in Hampden County to John F. Baldwin that the heirs of John W. Baldwin, Joseph J. Baldwin or John F. Baldwin may have had. According to your research, these are the only parties that had an interest in the property other than John F. Baldwin and Ruby S. Baldwin.

To clarify the source of title for the future, it would be a good idea to include reference to the deeds in the back title that are the source of title in the proposed deed to the new owner.

It was a pleasure talking to you!  Please call with questions anytime.

Very truly yours,

Elizabeth J. Barton
Title Counsel

CERTIFICATE OF VITAL RECORD
VERIFY PRESENCE OF WATERMARK • HOLD TO LIGHT TO VIEW

# The Commonwealth of Massachusetts
## DEPARTMENT OF PUBLIC HEALTH
### REGISTRY OF VITAL RECORDS AND STATISTICS

195741

## The Commonwealth of Massachusetts

JOHN F. X. DAVOREN
SECRETARY OF THE COMMONWEALTH
DIVISION OF VITAL STATISTICS

**STANDARD
CERTIFICATE OF DEATH**

426

**1 PLACE OF DEATH**
Hampden (County)
Palmer 7-15 (City or Town)
Wing Memorial Hospital

PALMER (City or Town making this return)

Registered No. 20

(If death occurred in a hospital or institution, give its NAME instead of street and number)

**PHYSICIAN — IMPORTANT**

**2 FULL NAME** Ruby Selina (Welch) Baldwin
(If deceased is a married, widowed or divorced woman, give also maiden name.)

(Was deceased a U. S. War Veteran, if so specify WAR) --- 7-2-5

(a) Permanent Residence. No. 51 Mountain Rd. St. North Wilbraham, Mass.
(City or town and State)

Length of stay: In place of death 1 years 4 months days. In place of residence 60 years months days.

### MEDICAL CERTIFICATE OF DEATH

**3 DATE OF DEATH** February 4, 1970 (Month) (Day) (Year)

**4 I HEREBY CERTIFY**, That I attended deceased from May 1, 1969, to Feb. 4, 1970 I last saw her alive on Feb. 4, 1970 death is said to have occurred on the date stated above, at 6:00 P.m.

**DEATH WAS CAUSED BY: IMMEDIATE CAUSE**

| | | INTERVAL BETWEEN ONSET AND DEATH |
|---|---|---|
| (a) | Septicemia due to B-Proteus | 1 mo |
| (b) Due To | Chronic urinary infection due to B-Proteus | |
| (c) Due To | 5-940 | mos. |

**OTHER SIGNIFICANT CONDITIONS** Generalized arterio-sclerosis with senile changes — 3 yrs

Was autopsy performed? no
What test confirmed diagnosis? 

**5 Was disease or injury in any way related to occupation of deceased?** If so, specify 

(Signature) Ralph O. Brown, M. D. for Kenneth Gale Potee, M. D.
(Print or Type Name)
(Address) Palmer, Mass. Date 2/6/ 1970

**6** Adams Cem., Wilbraham, Mass.
Place of Burial or Cremation (City or Town)

**DATE OF BURIAL** February 7, 1970

**7 NAME OF FUNERAL DIRECTOR** Herbert Story
ADDRESS 475 No.Main St.,Palmer,Mass.

Received and filed February 9, 1970

**A TRUE COPY ATTEST:** John N. Brown (Registrar)

### PERSONAL AND STATISTICAL PARTICULARS

**8 SEX** Female **9 COLOR** White **10** SINGLE MARRIED WIDOWED DIVORCED UNKNOWN (write the word) Widowed

**11** If married, widowed, or divorced HUSBAND of 
(or) WIFE of John F. Baldwin (Husband's name in full)
(Give maiden name of wife in full)

**12 AGE** 80 Years 10 Months 21 Days If under 24 hours Hours Minutes

**13 Usual Occupation** Housewife (Kind of work done during most of working life)

**14 Industry or Business:** own home

**15 Social Security No.** --

**16 BIRTHPLACE** (City) Clinton, Mass. (State or country)

**17 NAME OF FATHER** John E. Welch

**18 BIRTHPLACE OF FATHER** (City) Manchester, England (State or country)

**19 MAIDEN NAME OF MOTHER** Sydney Burns

**20 BIRTHPLACE OF MOTHER** (City) Clinton, Mass. (State or country)

**21 Informant** Dr. Joseph V. Baldwin (Address) 51 Mountain Rd. Wilbraham, Mass.

I HEREBY CERTIFY that a satisfactory standard certificate of death was filed with me BEFORE the burial or transit permit was issued:
Joseph S. Gill (Signature of Agent of Board of Health or other)
Agent (Official Designation) Feb. 6, 1970 (Date of Issue of Permit)



**MARCH 18, 2005**

Stanley E. Nyberg
**Registrar of Vital Records and Statistics**

I, the undersigned, hereby certify that I am the Registrar of Vital Records and Statistics; that as such I have custody of the records of birth, marriage, and death required by law to be kept in my office; and I do hereby certify that the above is a true copy from said records.

IT IS ILLEGAL TO ALTER OR REPRODUCE THIS DOCUMENT IN ANY MANNER

VOID WITHOUT WATERMARK OR IF ALTERED OR ERASED

BOOK 2633 PAGE 41

No animal, livestock, or poultry of any kind, other than house pets, shall be kept or maintained on any part of said lot, and none shall be kept, bred or maintained for commercial use or purpose.

The consideration being under $100 no documentary stamps are affixed

Witness ..... my hand and seal this .......24th...... day of ........September 1958......

John F. Baldwin

### The Commonwealth of Massachusetts

Hampden        ss.        September 24, 1958

Then personally appeared the above named John F. Baldwin

and acknowledged the foregoing instrument to be    his    free act and deed before me

RECEIVED
SEP 2 5 1958
AT 11.15 A M AND
REC'D FROM THE ORIGINAL

Notary Public — Justice of the Peace

My commission expires    Dec   2   19 61

---

## 21818

We, WILLIAM V. BALDWIN and JOSEPH V. BALDWIN, both married and both of Wilbraham, Hampden County, Massachusetts, and I, LOYOLA W. KEATING, married of No. Stamford in the State of Connecticut, for consideration paid grant to JOHN F. BALDWIN, unmarried of Wilbraham, Hampden County, Massachusetts

All and singular the real estate of record in said Hampden County now belonging to John F. Baldwin, late of Wilbraham, not previously conveyed or devised. SUBJECT TO all encumbrances of record. The grantors and the grantee are all of the heirs of the said John W. Baldwin, deceased, and of Joseph J. Baldwin, deceased.

The consideration being under $100 no documentary stamps are affixed.

I, Helena Baldwin wife of said William V.; I, Marie Baldwin wife of said Joseph V.; and I John F. Keating husband of said Loyola W., release to said grantee all rights of tenancy by the curtesy, dower and homestead and other interests therein.

WITNESS our hands and seals this .....first..... day of August, 1958.

William V. Baldwin
Helena Baldwin
Joseph V. Baldwin
Marie Baldwin
Loyola W. Keating
John F. Keating

### THE COMMONWEALTH OF MASSACHUSETTS

Hampden ss        August 1, 1958

Then personally appeared William V. Baldwin and acknowledged the foregoing instrument to be his free act and deed, before me

RECEIVED
SEP 2 5 1958
AT 11.15 A M AND
REC'D FROM THE ORIGINAL

Notary Public

My Commission expires December 2, 1961

TOTAL P.02



**EXHIBIT 5**

 *First American*
*Title Insurance Company*

April 15, 2005

Bacon & Wilson, P.C.
33 State Street
Springfield, MA 01103

RE: Patriot Ridge Lane, Wilbraham, MA

Dear Attorney Robert Murphy

This letter confirms that we are unable to insure the title to real property located at Patriot Ridge Lane, Wilbraham, MA by deed dated April 11, 2000 and recorded in the Hampden County Registry of Deeds in Book 11182, Page 221, our position results from the one-third interest of Joseph V. Baldwin and our uncertainty that his interest was ever conveyed. Joseph V. Baldwin acquired his interest from the estate of his father, John F. Baldwin (Sr. or elder) who died in1947. The Probate is on file in the Hampden County Registry of Probate.

Joseph V. Baldwin was one of three grantors in a deed dated August 1, 1958 and recorded in the Hampden County Registry of Deeds in Book 2633, Page 41. The property was conveyed to his brother John F. Baldwin (Jr. or younger). In this deed, the property conveyed is described as:
"All and singular the real estate of record in Hampden County now belonging to John W. Baldwin, late of Wilbraham, not previously conveyed or devised. Subject to all encumbrances of record. The grantors and the grantees are all the heirs of the said John W. Baldwin, deceased, and of Joseph J. Baldwin, deceased".

John W. Baldwin, deceased of Wilbraham, is the father of John F. Baldwin (Sr. or elder) and would be the grandfather of Joseph V. Baldwin (owner of the one-third) and John F. Baldwin (Jr. or younger).

We believe that the language in the deed description limits what is being conveyed. The land being described is that of John W. Baldwin, late of Wilbraham, NOT PREVIOUSLY CONVEYED OR DEVISED. The one third interest that Joseph V. Baldwin inherited was land that was BOTH devised and conveyed to his father John F. Baldwin (Sr. or elder), who was one of the heirs of John W. Baldwin.

Furthermore, the description in the deed states that the grantors and grantees are heirs of John W. Baldwin and Joseph J. Baldwin. Joseph V. Baldwin (owner of the one third interest) is neither. He was the heir of John F. Baldwin (Sr. or elder). The deed does not state that Joseph V. Baldwin is conveying the interest derived from his father. That may have been the intent of the deed, but based on the actual deed language, we do not believe that the interest of Joseph V. Baldwin, which was derived from his father, was conveyed.

One Monarch Place, Suite 1120, Springfield, MA 01144-1120
TEL 413.733.2526 ▾ TOLL FREE 800.579.0462 ▾ FAX 413.733.5816
WWW.FIRSTAMNE.COM

Therefore, based upon the information we received and documents that we have reviewed, we are unable to insure title to this land at this time.

Sincerely,
First American Title Insurance Company

By:  Stephen M. Leecock
Branch counsel

SML/jh